## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 45345

STATE OF IDAHO,

      Plaintiff-Respondent,

v.

MARTIN EDMO ISH,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

Boise, November 2019 Term

Opinion Filed: April 13, 2020

Karel A. Lehrman, Clerk

---

Appeal from the District Court of the Sixth Judicial District, State of Idaho, Bannock County. David Nye, District Judge.

The district court's judgment of conviction is <u>vacated</u> and <u>remanded</u> for a new trial.

Eric D. Frederickson, State Appellate Public Defender, Boise, for appellant. Sally J. Cooley argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

---

BURDICK, Chief Justice.

Martin Edmo Ish appeals from the judgment of conviction and sentence entered against him by the district court for one count of voluntary manslaughter. The State charged Ish with second-degree murder in November 2015 for the June 2009 killing of Eugene Lorne Red Elk in Pocatello, Idaho. A trial was held in April 2017 after which the jury found Ish guilty of the lesser-included charge of voluntary manslaughter. Ish appeals and asserts error in the jury-selection process, evidentiary rulings, destruction of evidence, and jury instructions. For the reasons below, we vacate the judgment of conviction and remand for further proceedings.

### I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of June 14, 2009, Ish and some friends were barhopping in Pocatello, Idaho. At one point, the group patronized the Bourbon Barrel until the staff ordered Ish to leave after a confrontation with bar staff. Ish's friends took him a few blocks down the road to Duffy's Tavern. Ish's friends returned to the Bourbon Barrel. When Bourbon Barrel staff learned of Ish's

1

whereabouts, they phoned Duffy's Tavern to inform them of Ish's actions earlier that evening. Upon receiving the call, Red Elk, who was working as a bouncer that night, asked Ish to leave the bar and he complied. A short time later, Red Elk left the bar to visit his girlfriend.

A patron drove up to Duffy's Tavern and found Red Elk lying in the parking lot gurgling blood. She alerted the bar, the police were called, and an investigation followed. Red Elk was taken to the local emergency room where it was determined that he had suffered a brain injury from blunt force trauma to the head. He was life-flighted to a medical center in Idaho Falls for surgery. He died three days later.

At Duffy's Tavern, police interviewed patrons and employees. They also obtained surveillance footage from the inside of the bar. In the weeks and months that followed, Ish was a suspect but the police also investigated the possibility that Red Elk was struck by an automobile. The police investigation into Red Elk's death went cold until almost six years later when, in 2015, two witnesses contacted police. One witness testified that the morning following Red Elk's injury, Ish admitted that he "blasted" Red Elk and he "was pretty sure he killed him because he was laying [sic] there gurgling." With the new witnesses, the State filed a complaint in June 2015 charging Ish with first-degree murder. The State later amended the charge to second-degree murder and alleged that Ish struck Red Elk in the head with a blunt object.

Before trial, Ish filed a motion to compel which sought an explanation for the "lost video" of surveillance footage from Duffy's Tavern. Ish had obtained a DVD copy of footage from Duffy's Tavern, but insisted on an explanation for the absence of the original and an overview of the circumstances that produced the copy. The State admitted that the tape should not have been destroyed during a police cleaning of its evidence room, but argued that its destruction was inadvertent, and thus, Ish could not show that it was done in bad faith. After a hearing, the district court treated Ish's motion as a motion to dismiss based on spoliation of evidence and ruled that Ish was unable to prove bad faith, and thus, there was no due-process violation requiring dismissal.

Ish's case received considerable attention in the local media. As a result, the district court ordered that the jury pool be selected from Twin Falls County, that the final jury be sequestered in Pocatello, and that juror names would not be used or released. Jury selection began on April 12, 2017, and continued for a full day. During voir dire, Juror 3 was questioned in chambers after she disclosed that she was familiar with the case from social media. In chambers, Ish challenged Juror 3 for cause, which the State opposed. The district court denied Ish's challenge for cause and Juror

2

3 resumed her place in the panel. After voir dire, each side exercised all 12 of their peremptory challenges to strike potential jurors from the pool. With the final 14 jurors selected but not sworn in, Ish raised a timely *Batson* challenge outside the presence of the jury pool alleging that the State had improperly used its peremptory challenges in order to eliminate all minorities from the jury. Ish argued that the prosecution used 6 of its peremptory challenges to strike the only 6 potential jurors who were minorities. The State stipulated that the jurors were members of a protected class.[1] The lead prosecutor offered his race-neutral reasons for striking each juror, at times consulting with other members of the prosecution team.

With five days remaining between the end of jury selection and opening statements, the district court took the matter under advisement. Ish filed a written memorandum in which he specifically pointed to Juror 1 to argue that the State's proffered reason for striking him was pretextual because other jurors had expressed concerns about work and childcare and they were not struck. The State filed a brief in opposition, expanding on its explanations for the strikes and including excerpts purportedly from its notes on the jury questionnaire and voir dire.

The district court denied Ish's *Batson* challenge. The district court found that the prosecutor did not strike the six jurors with discriminatory intent. In its analysis, the Court recited the prosecution's proffered reasons. Relevant here, the district court said the following regarding Juror 1 and Juror 3:

> In relation to Juror 1, the State asserts that this individual is employed in the agricultural industry as well as being a volunteer firefighter and that while being questioned he had expressed these work related concerns as well as worrying about caring for his 4 year old daughter. Their conclusion was that he would be a distracted juror. The Court would also note that in his questionnaire he explained in detail the hardship serving on a jury would cause him in relation to work and his family situation.

> In regards to Juror 3, the State reminded the Court that this was an individual who had been the subject of an in-camera voir dire interview as she had indicated some knowledge of the case due to media attention. Because media was the reason this case had to be removed from Bannock County to Twin Falls County for the purpose of selecting a jury in the first place, after discussing the matter with her, the State moved to dismiss Juror 3 for cause. The Court denied the Motion and the State used a peremptory challenge to excuse her.

---

[1] Because the State stipulated to this fact, there is no indication as to what protected class the struck jurors allegedly represented. The district court does note in its ruling that each struck juror had names that denoted Hispanic descent but emphasized that it need not make any determination on that matter given the stipulation.

The district court then looked to see how "similarly situated" jurors were treated to assess the State's proffered explanations. It began by noting that "Jurors 3, 21, 23, 37 were all dismissed for reasons unique to them, their demeanor, and their circumstances[,]" so a comparison was "not available." Nevertheless, it concluded that "the unique reasons make the assertion that they were challenged because of race less likely."

For Juror 3, the district court remarked that she had been challenged for cause because "of well-articulated concerns" based upon her "experiences in relation to this trial." Though it did not grant the for-cause challenge, the reasons for that challenge "were not racial, and . . . are not under heightened scrutiny when done through valid peremptory challenges." Thus, the challenge directed at her "appear[ed] valid based upon the evidence."

> In regards to Juror 1, the district court wrote:

> Juror 1 and Juror 36 were dismissed, in part, for work related issues, and in part for family issues. These are both difficult questions because unless retired, every juror on the panel would presumably have a work issue, and depending on age and circumstance most people also have family issues.

> In regards to employment however, certain people clearly and forcefully expressed work related stresses above and beyond other prospective jurors. Juror 17 for example opened a restaurant with his wife in the past month and stated that being away during this start-up phase would be very difficult. He was dismissed by the State. Juror 41 also works in the agriculture industry and indicated on his questionnaire that this is a busy time of year and that missing work would be an extreme hardship. He was dismissed by the State as well. It is not simply a pretext to say the State dismissed Juror 1 and Juror 36 for work issues, because it was clearly a true consideration as they released other prospective jurors (Caucasian jurors) for the same reasons.

> In regards to family concerns, Juror 1 has a four year old child and Juror 36 has an 18 month old child. Both expressed concerns about being away from their young children during sequestration. Juror 18 was released by the State and is the parent to a 4 year old and a 6 month old. Juror 48 was also released by the State and he has three children, including a 6 year old. Again, it cannot be said that reasons related to family and small children are invalid and only a pretext for racial bias when the State challenged other similarly situated, non-minority jurors as well.

The district court concluded that, based on all the evidence provided to it, Ish had failed to show that the prosecutor acted with discriminatory intent:

> Based upon all information before the Court, it appears that there were numerous reasons, all race-neutral, for which the six jurors in question were dismissed by peremptory challenge. . . .

"The party asserting discriminatory use of a peremptory challenge bears the ultimate burden of persuasion and must show that purposeful discrimination was, in fact, the basis for use of the peremptory challenge." [*State v. Foster,* 152 Idaho 88, 91, 266 P.3d 1193, 1196 (Ct. App. 2011).] In this case, the Defense has not met their burden. The State has been able to articulate reasons for challenging each of the six jurors in question, none of which had to do with race. Their explanations also do not appear to be a mask for hiding discrimination but are based on reasons which the Court would note were the subject of in camera interviews (with 2 jurors) as well as questioning in open court during the voir dire process (relating to the other 4). . .

A trial took place and the jury returned a verdict of guilty on the lesser-included charge of voluntary manslaughter. After trial, Ish filed a subpoenas duces tecum seeking the prosecution's voir dire notes to support a "renewed *Batson* challenge." The district court granted the State's motion to quash the subpoena and ruled that the notes were protected work product under Idaho Criminal Rule 16 and not subject to disclosure.

Ish timely appeals.

## II. STANDARD OF REVIEW

Generally, this Court "will uphold a judgment of conviction entered upon a jury verdict so long as there is substantial evidence upon which a rational trier of fact could conclude that the prosecution proved all essential elements of the crime beyond a reasonable doubt." *State v. Kralovec*, 161 Idaho 569, 572, 388 P.3d 583, 586 (2017) (quoting *State v. Severson*, 147 Idaho 694, 712, 215 P.3d 414, 432 (2009)).

## III. ANALYSIS

The dispositive issue on appeal regards Ish's *Batson* challenge. Ish urges this Court to find clear error in the district court's finding that the prosecutor did not strike minority jurors with discriminatory intent. For the reasons explained below, we determine that, under controlling authority and in light of all the circumstances surrounding the strike of Juror 3, the district court's finding that the prosecution did not strike Juror 3 with discriminatory intent is clearly erroneous. As this amounts to structural error, we vacate the judgment of conviction and sentence and remand for further proceedings. We also reach the spoliation issue raised by Ish. However, all other issues on appeal are rendered moot by our order for a new trial.

**A. The district court's finding that the prosecution did not strike Juror 3 with discriminatory intent is clearly erroneous.**

In *Batson v. Kentucky*, the United States Supreme Court ruled that a State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors

5

in a criminal trial. 476 U.S. 79 (1986). The Equal Protection Clause requires a criminal trial free from racial discrimination in the jury-selection process. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019). This includes the use of peremptory challenges despite their old credentials and history of being used "no questions asked." *Id.* at 2242. The Supreme Court has "vigorously enforced and reinforced" *Batson*'s holding and "guarded against any backsliding." *Id.* at 2243. A single discriminatory peremptory strike violates the Equal Protection Clause. *See id*. at 2241 ("In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many."). That the defendant is of a different race than the excluded jurors does not matter. *Id.* at 2243 ("A defendant of any race may raise a *Batson* claim, and a defendant may raise a *Batson* claim even if the defendant and the excluded juror are of different races."); *Powers v. Ohio*, 499 U.S. 400, 415 (1991).

*Batson* challenges proceed in three steps designed to "permit[] prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." *Hernandez v. New York*, 500 U.S. 352, 358 (1991). First, a defendant must make a prima facie showing that a peremptory challenge has been exercised with discriminatory intent. *State v. Araiza*, 124 Idaho 82, 87, 856 P.2d 872, 877 (1993). Second, if that showing has been made, the prosecution "must come forward with a racially-neutral explanation for challenging the prospective juror." *Id.* Third, the trial court must "determine whether the explanation offered by the state overcomes the inference of discrimination established by the defendant's prima facie showing." *Id.* The moving party "bears the ultimate burden of persuasion and must show that purposeful discrimination was, in fact, the basis for use of the peremptory challenge." *Id.*

*Batson*'s third step requires the district court to evaluate the prosecutor's credibility to determine whether to accept the prosecutor's proffered reason or whether it is simply masking discriminatory intent. "[T]he best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge," *Snyder*, 552 U.S. at 477 (quoting *Hernandez*, 500 U.S. at 365). "[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's firsthand observations of even greater importance." *Id.* When such a reason is offered, "the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor."

6

*Id.* "Whether a prosecutor intended to discriminate on the basis of race in challenging potential jurors is . . . a question of historical fact." *Hernandez*, 500 U.S. at 367.

The Supreme Court left to trial courts the task of "develop[ing] rules . . . to permit legitimate and well-founded objections to the use of peremptory challenges" without "unnecessary disruption of the jury selection process[.]" *Powers*, 499 U.S. at 416. This reflects that the "job of enforcing *Batson* rests first and foremost with trial judges." *Flowers*, 139 S. Ct. at 2243 (citing *Batson*, 476 U.S. at 97, 99 n. 22). Appellate review accords great deference to the trial court's finding of discriminatory intent and will not disturb that finding absent clear error. *Araiza*, 124 Idaho at 87, 856 P.2d at 877 ("[W]e will only overturn the trial court's finding if it is clearly erroneous in light of the facts as a whole."); *Snyder*, 552 U.S. at 477 ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."). The factual findings of a trial court in a criminal case "are reviewed for clear error while the determination of whether the constitutional requirements have been met is reviewed de novo." *State v. Buti*, 131 Idaho 793, 796, 964 P.2d 660, 663 (1998). Such factual findings "should be overturned only if not supported by substantial evidence." *State v. Kirkwood*, 111 Idaho 623, 625, 726 P.2d 735, 737 (1986).

The United States Supreme Court's decision in *Snyder v. Louisiana* is instructive when it comes to the ultimate issue in this case. 552 U.S. 472. There, a murder defendant made a *Batson* challenge to the prosecutor's peremptory strikes of all five of the black prospective jurors left at the peremptory challenge stage. *Id.* at 475–76. The district court overruled the challenge without explanation. *Id.* at 479. On appeal, the Supreme Court determined that the prosecutor's use of a peremptory challenge on one juror was, by itself, dispositive of discriminatory intent when viewed in light of all the other circumstances. *Id.* at 478. That juror was a college senior attempting to fulfill his student teaching requirements during the same time period trial would take place. *Id.* at 480–81.

The Court found that the prosecutor's first proffered reason for striking the student—he had expressed concern about missing class and the prosecutor claimed that he might hurry up the trial by finding for a lesser-included offense—to be demonstrably pretextual. *Id.* at 478–80. The Court highlighted that the student teacher was one of more than 50 members who had said that they would experience hardship from service and sequestration and that the student expressed no additional concerns once the judge's law clerk had spoken with the student's Dean and figured out

7

a workaround. *Id.* at 481. Furthermore, the Court emphasized that the notion that the student would rush to find a lesser-included offense was highly speculative. *Id.* at 482. The Court also refused to credit the prosecution's second reason that the college student appeared nervous throughout voir dire. *Id.* at 479. Because nervousness could not be shown from a cold record, the Court concluded that it could not "presume that the trial judge credited the prosecutor's assertion that [the student] was nervous," explaining:

> The trial judge was given two explanations for the strike. Rather than making a specific finding on the record concerning [the student's] demeanor, the trial judge simply allowed the challenge without explanation. It is possible that the judge did not have any impression one way or the other concerning [the student's] demeanor. [The student] was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned. Thus, the trial judge may not have recalled [the student's] demeanor. Or, the trial judge may have found it unnecessary to consider [the student's] demeanor, instead basing his ruling completely on the second proffered justification for the strike.

*Id.* Accordingly, the Court determined that the district court's implicit finding of lack of discriminatory intent was clearly erroneous. *Id.*

1. Ish's *Batson* challenge was timely.

As a preliminary matter, we note that Ish's *Batson* challenge was timely. Ish raised the *Batson* challenge once the final jury was selected, but before the final jury was sworn and the remainder of the venire had been dismissed. This was the proper juncture to do so. *See State v. Valdez*, 140 P.3d 1219, 1234–35 (Utah 2006) (holding that "a *Batson* challenge must be raised before the jury is sworn and before the remainder of the venire has been excused in order to be timely . . . .").

2. Ish made a prima facie showing that the peremptory challenges were exercised on the basis of race.

Both below and on appeal, both parties agree that Ish made a prima facie showing of discrimination under *Batson*'s first step. Accordingly, we need not and do not address this step.

3. The prosecution offered a race-neutral basis for striking the jurors in question.

On appeal, Ish contends that the State failed to carry its burden to provide race-neutral, non-pretextual reasons for its challenges. In response, the State contends that it met the minimal requirements of *Batson*'s second step. We agree with the State.

While "there are any number of bases on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause," the prosecutor must give "a clear

8

and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Batson*, 476 U.S. at 98 n. 20 (citations and internal punctuation marks omitted). "[The] explanation must be racially neutral and may not be based on an assumption that a juror will be partial to the defendant based on the juror's race or on any racial stereotype." *Araiza*, 124 Idaho at 87, 856 P.2d at 877. "In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." *Hernandez*, 500 U.S. at 359.

"What [*Batson*] means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem*, 514 U.S 765, 769 (1995). *Batson*'s second step "does not demand an explanation that is persuasive, or even plausible." *Id.* at 767–68. The focus is on "the facial validity of the prosecutor's explanation," so "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez*, 500 U.S. at 360). For instance, a juror's demeanor can supply a valid race-neutral reason. *See Thaler v. Haynes*, 559 U.S. 43, 48 (2010). Likewise, a prosecutor's challenge based on a juror's "long, unkempt hair, . . . mustache, and . . . beard" has been found to satisfy *Batson*'s second step. *Purkett*, 514 U.S. at 769. What a prosecutor may not do is provide overly general reasons such as "demeanor" or baldly assert that they did not exercise the challenges with discriminatory motive. *See id*.

Here, the district court did not err in accepting the prosecution's proffered race-neutral explanations. Taking the reasons proffered at the in-chambers hearing, the prosecution articulated reasonably specific, race-neutral reasons:

- **Juror 1:** Would be distracted because he worked in the farm industry, it was the "busy season," and he was worried about his ability to look after his kids.

- **Juror 3:** Was familiar with the case from various media sources, so the prosecution was uncertain about whether she would be able to set aside what she had learned for trial. Also, "she seemed a bit out of it, like she was kind of zoned out" or possibly "high."

- **Juror 21:** Was "difficult" and "looked genuinely pissed and not interested in being [at jury selection]"; he didn't know if he could be impartial, and lacked of ability or desire to communicate; he might have a preconceived idea that law enforcement could not be trusted based on his opinions about the documentary "Making a Murderer."

- **Juror 23:** Would be distracted by her concerns about a domestic assault that occurred recently and that might "bleed over" into this case based on her worries about whether the defendant would come after her if she voted to convict.

9

- **Juror 36:** Had her "hands full" with her job and her 18-month old child, and she had a friend with a daughter who had been murdered, and "apparently that case didn't get resolved in a manner she thought it should have."

- **Juror 37:** Would not be able to separate Ish's case from a case where her uncle was convicted of second-degree murder for an incident at an Idaho bar that she felt hadn't be resolved correctly and that the people involved weren't held accountable.

These are not vague assurances of lack of discriminatory intent, nor are they general assertions such as "demeanor." The prosecutor provided specific reasons and explained the basis for those reasons. Ish has failed to show how any of these explanations are discriminatory on their face. The district court did not err by determining that these reasons cleared *Batson*'s second step. Whether these reasons are supported or convincing is left for *Batson*'s third step.

4. In light of the parties' submissions, the district court's finding that the prosecutor did not strike Juror 3 with discriminatory motive is unsupported by substantial, competent evidence.

Ish argues that the district court erred when it concluded that he failed to show purposeful discrimination by incorrectly conducting a proper side-by-side comparative juror analysis. Ish urges this Court to consider the statistical evidence and conduct our own side-by-side juror comparison. This, Ish argues, will show that the district court committed clear error when it found that there was no discriminatory intent. Ish claims that excluding all of the minority jurors can only demonstrate discriminatory intent.

At *Batson*'s third step, the trial court "must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *Flowers*, 139 S. Ct. at 2243. This includes determining whether the defendant has "carried his burden of proving purposeful discrimination." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) ("*Miller-El I*") (quoting *Hernandez*, 550 U.S. at 359). The "critical question in determining whether [the *Batson* challenger] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Id.* at 338–39. If a district court finds that a prosecutor's proffered reasons are pretextual, this gives rise to an inference of discrimination. *Snyder*, 552 U.S. at 485. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El I*, 537 U.S. at 339.

10

To support a claim that a prosecutor's peremptory strikes were made with discriminatory intent, the defendant may present "a variety of evidence," including, but not limited to:

- statistical evidence about the prosecutor's use of peremptory strikes against minority prospective jurors as compared to non-minority prospective jurors in the case;

- evidence of a prosecutor's disparate questioning and investigation of minority and non-minority prospective jurors in the case;

- side-by-side comparisons of minority prospective jurors who were struck and non-minority prospective jurors who were not struck in the case;

- a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

- relevant history of the State's peremptory strikes in past cases; or

- other relevant circumstances that bear upon the issue of racial discrimination.

*Flowers*, 139 S.Ct. at 2243 (citations omitted).

*a. Statistical Evidence*

Ish highlights the fact that the prosecution struck all the minority jurors left in the jury pool to suggest that discriminatory intent may be inferred from this fact alone. The State argues that this fact, on its own, is insufficient to show clear error in the district court's determination that there was not purposeful discrimination. We conclude that the prosecution's use of six of its twelve peremptory challenges to strike all six remaining minority jurors is insufficient, on its own, to constitute clear error.

The use of peremptory challenges resulting in discriminatory impact raises an inference of discriminatory intent. *Miller-El I*, 537 U.S. at 342 (commenting that "[h]appenstance is unlikely to produce [the] disparity" of only one African American juror serving when 10 of the prosecutor's 14 peremptory strikes were used against African Americans). That said, the Supreme Court has never held that 100% exclusion rate is conclusive proof of discriminatory intent and has always used qualified language regarding statistical analysis. *See, e.g.*, *Miller-El v. Dretke (Miller El II)*, 545 U.S. 231, 241 (2005) ("*More powerful* than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve."); *Miller-El I*, 537 U.S. at 342. Statistics may show discriminatory impact, but numbers alone do not compel a finding of discriminatory intent. *See Hernandez*, 500 U.S. at 363. To be clear: Statistics, if stark, may raise a strong inference of discrimination. *See Batson*, 476 U.S. at 93 ("We have observed that under some circumstances proof of discriminatory impact 'may for all

11

practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds."). But just as a 100% exclusion rate will not always require a finding of discriminatory intent, something less will not always indicate the absence of discriminatory intent. *Flowers*, 139 S. Ct. at 2246 (noting that the Court has "skeptically viewed" a prosecutor's decision to accept one minority juror while excluding all others because it might be a tactic "to obscure the otherwise consistent pattern of opposition to" seating black jurors) (citing *Miller El I*, 545 U.S. at 250).

Here, the prosecution struck all six of the minority jurors. That fact is strong evidence of discriminatory intent. But on its own, that fact is insufficient to find clear error without looking at other circumstances in the district court's finding. Below, the parties urged other relevant considerations, and the district court was required to "consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *Flowers*, 139 S. Ct. at 2243. We do the same on appeal. *Id.*

b. *Comparative Juror Analysis*

The first of Ish's arguments concerning comparative analysis faults the district court's deviation from the analysis. He argues that the district court improperly departed from the accepted comparative juror analysis by comparing the State's proffered reasons as applied against jurors who the State did strike, as opposed to those who it did not strike. Ish claims that since the State never offered its reasons for striking those jurors, the district court's findings in this regard lacked substantial, competent evidence. Specifically, Ish challenges the district court's findings that Jurors 18 and 48 were struck for family reasons and that Jurors 17 and Juror 41 were struck for employment reasons because the prosecution did not articulate its reasons for striking them. We determine that the district court's comparative analysis does not constitute clear error.

*Batson* jurisprudence stresses that "trial courts have broad discretion in formulating the necessary framework for evaluating the explanation given by the state for use of peremptory challenges after a *Batson* objection." *Araiza*, 124 Idaho at 87, 856 P.2d at 877. A defendant may present, and the court may evaluate, "side-by-side comparisons of [minority] prospective jurors who were struck and white prospective jurors who were not struck in the case[.]" *Flowers*, 139 S. Ct. at 2243. Such comparisons "can suggest that the prosecutor's proffered explanations for striking [minority] prospective jurors were a pretext for discrimination." *Id.*; *see also Araiza*, 124 Idaho at 88, 856 P.2d at 878 ("Comparison evidence is evidence asserting pretext."). For instance,

12

"[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El II*, 545 U.S. at 241. Likewise, the State's "failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Id.* at 246. When comparison evidence is offered, the comparison is narrowly focused on the proffered reason given by the prosecution as applied to other jurors, not merely jurors who were similar for reasons not touched upon by the prosecution's proffered reason.

The district court's responsibility at *Batson*'s third step is to assess the credibility of the prosecutor's proffered reasons. We have previously declined to require Idaho trial courts to conduct a comparative-juror analysis sua sponte. *Araiza*, 124 Idaho at 88, 856 P.2d at 878. On appeal "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." *Snyder*, 552 U.S. at 483. "[A]n appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." *Id.* However, when a party advances such an argument below, the trial courts should make "specific findings concerning the effect of the evidence on the trial court's decision." *Araiza*, 124 Idaho at 88, 856 P.2d at 878.

Here, the district court did not conduct a traditional side-by-side juror analysis because the court compared the State's proffered reasons as applied against jurors the State did strike, as opposed to those who ultimately served on the jury. Before the district court conducted its analysis, it recognized that its variation of a side-by-side comparison was "not necessarily part of any test," but that it would nevertheless "help[] the Court determine if the reasons given are valid or simply masking discrimination." Accordingly, the district court looked to the struck jurors for the same purpose as the traditional analysis—to determine whether the State's proffered reasons were pretextual. That is, if the State struck similarly situated non-minority jurors, the district court inferred that the State's proffered reasons were *not* pretextual because it exercised that reason in a non-discriminatory manner. If the prosecutor struck a minority juror because of "Reason A," but also struck a non-minority juror for "Reason A", then that supports the inference that "Reason A" is a legitimate, non-discriminatory reason for the strike, rather than pretext. Tellingly, if the State did not strike these similarly situated jurors, Ish would likely be pointing at them as proof of the State's discriminatory intent under the traditional analysis. Thus, we find no error in the district

13

court's variation on the traditional analysis. That said, we give this analysis less weight than we would a traditional juror analysis because it is susceptible to manipulation. An ill-intentioned prosecutor could "cover his tracks" with leftover peremptory challenges after striking all potential minority jurors.

The district court also did not err by narrowing the comparison advanced below. For instance, the district court noted that while most jurors expressed that jury service and sequestration would cause a hardship concerning employment, the district court noted that certain jurors "clearly and forcefully expressed work related stresses above and beyond other prospective jurors." Finding such nuances in juror demeanor is well within the discretion of the trial court and is entitled to great deference on appeal.

Ish next asserts that if the district court had properly applied the traditional analysis, it would have found that the State failed to establish a non-discriminatory reason to strike Juror 1 or Juror 3. Specifically, Ish argues that the State's proffered reason for Juror 1—hardship—is pretextual because the State failed to excuse other jurors who expressed similar concerns (such as Juror 4 and Juror 9 for work concerns or Juror 20 and Juror 25 for child-care concerns). As for Juror 3, Ish argued that the State's proffered reasons—exposure to media about the case and that she seemed prone to distraction—were also pretextual. Ish points out that while the district court found that the State had previously sought to exclude Juror 3 for cause, it was actually the defense who sought to exclude Juror 3 for possible media bias and did so over the State's objection.

Relevant to our analysis are two questions presented in the jury questionnaire:

102. Do you have any personal or other concerns that might cause you to be distracted during trial or to "hurry along" the process of decision making in the jury room, if you were selected as a juror? Yes _____ No _____

If yes, please explain _____

106. It is expected that this case will take 8–10 days for trial. During that time the jury will be sequestered in Pocatello, Idaho. We are aware that this will create hardship for all jurors. However, it is necessary to ensure that both sides receive a fair and impartial trial given the extent of pre-trial publicity involved. If this will create undue or extreme hardship on you, please explain the undue or extreme hardship.

**Juror 1**

The prosecutor's proffered reason for striking Juror 1 was he believed the juror would be distracted during trial because it was his "busy season" and he had to take care of his kids. In his questionnaire, Juror 1 checked the box indicating that he would "hurry along" the proceedings

14

because it was the "busy months" and he needed to get to work "as soon as possible." He also signaled that serving would be an undue hardship because it was the "busyest [sic] time" for his work, he was a volunteer firefighter, and he had to take care of his daughter. At voir dire, the prosecutor asked Juror 1 about 10 questions on both his work and a family member's experiences with law enforcement, culminating in the following exchange:

> MR. HERZOG: So is there anything about that that would make it difficult for you to be fair both to the State and to Mr. Ish?
>
> [Juror 1]: Just the farming part, delivery, and picking up my daughter from school every day.
>
> MR. HERZOG: Okay. But nothing about that – the crime?
>
> [Juror 1]: No, not really.

At the *Batson* hearing, the State did not exclude Juror 1 because of "compassion" or "hardship." Verbatim, the prosecutor said: "[I]t was our opinion that, being the busy season, that he would be a person who would be distracted by being on a jury, and that it was basically a — we don't want anyone on our jury who is going to be thinking about nothing but losing money during the growing season." Thus, the proper comparison for Juror 1 would be those jurors who expressed that they would be distracted during trial.

Both Juror 9 and Juror 25 are dissimilar from Juror 1 because each indicated that they would not be distracted during trial by checking "No" on question 102. Juror 9 did indicate that he would experience hardship in Question 106. However, he nevertheless checked "No" to Question 102. The same is true of Juror 25. While she expressed concerns of hardship ("My husband might have a hard time taking care of my children and working at the same time."), she also checked "No" when asked whether she had concerns that might be a distraction for her during trial. Thus, no adequate comparison exists because most jurors would experience hardship from sequestration, but only a few indicated that it would be a distraction for them at trial.

For example, Juror 4 and Juror 20 both indicated that they might be distracted during trial by checking "Yes" in question 102. However, while Juror 4 also explained that "this is a slow time of year and it's very possible to work around 8–10 days." This stands in sharp contrast to Juror 1's unequivocal statements how the busy season would distract him, so the State's decision to accept Juror 4 does not show pretext. Juror 20 is a more difficult question. To explain why she thought she would be distracted during trial, Juror 20 wrote, "I'm on an adoption waiting list & could be called for a baby at any time, also being away from my 3 year old and family." At voir dire, Juror

15

20 spoke up when asked about hardship by the district court. She did not mention the adoption, and started by explaining that she was a schoolteacher, so lack of internet access would cause her to fall behind in her grading. She also mentioned her three-year-old, but stated that she "understood" that sequestration would impose a hardship on everyone. The State did not ask any questions of Juror 20, but the district court told her that she could have supervised internet access to conduct her grading, which Juror 20 said she was comfortable with.

The similarities between the work and child-care responsibilities of Juror 1 and Juror 20 raise some suspicions as to the State's lack of questioning for Juror 20 and its decision not to strike her. However, the district court offered a workaround for her main distraction concern before voir dire reached the phase involving party participation. As a result, we cannot conclude that this discrepancy, by itself, rises to the level of clear error on appeal.

**Juror 3**

Juror 3 presents a different problem than Juror 1. During the court-conducted portion of voir dire, Juror 3 revealed that she had heard about the case on Facebook and had read user comments. When the court asked the parties whether they had any questions for Juror 3, the State declined the invitation, but Ish's counsel took the opportunity. Questioning moved into chambers where both parties asked questions. Juror 3 explained that she had seen a Facebook post about Red Elk's killing and she had read user comments stating their opinions on how it happened. When asked by the prosecutor whether she would be able to set this aside and focus solely on the facts presented at trial, Juror 3 explained that she would do her best, but could not say whether she could actually do so. Ish's counsel questioned her about the jury questionnaire in which she indicated that she would be concerned by reactions to the verdict from the media. She indicated that the possibility of publicity surrounding the verdict gave her anxiety. Ultimately, Ish challenged for cause, and the State opposed:

> MR. SCHULTHIES: I guess, for the record, I would challenge for cause. Part of the reason we came here is to try and escape the media blitz.
>
> THE COURT: We'll never escape Facebook.
>
> MR. SCHULTHIES: Yeah. So I appreciate your honesty, but I would challenge for cause.
>
> THE COURT: Mr. Herzog, do you want to respond?
>
> MR. HERZOG: Well, I think she said that, you know, she was really—I can't remember exact words—but I think, committed to trying to set aside anything she's heard in the media and consider only the facts presented at trial. And I think that's

16

really ultimately all we can expect from any juror if they may have heard something as to be committed to that, although I know there was some equivocation.

THE COURT: It seems to me that there's two issues here: One is what happens after a verdict is reached and what the media does with those results. That, I can deal with by not giving them any jurors' names. Nobody will know you were on this jury unless you tell them. The other issue, though, is whether or not you can be fair and impartial and set aside what you've heard before and try this case based upon what's been heard in the courtroom. You've told me that you would give it your best shot, and that you—I heard you say, "I think I could do that." I'm not going to excuse you at this time, but we'll see how things go. So the motion's denied, and you can go back to your seat. Okay? Keep answering the questions, though.

At the *Batson* hearing, the State explained its peremptory challenge on Juror 3 based on her exposure to the media. Following this explanation, the district court asked the following:

THE COURT: She's one we brought in here, isn't she?
MR. HERZOG: Yes.
THE COURT: And you challenged her for cause, and I denied it.
MR. HERZOG: Yes.
MS. GRAHAM [a second prosecutor]: Yes.
MR. HERZOG: Correct.

Afterwards, the prosecutors conferred amongst themselves and then offered an additional reason, explaining that "she seemed—observing her, and maybe there were more people that seemed really, kind of—she seemed a bit out of it, like she was kind of zoned out. And I don't know . . ." A second prosecutor interjected to volunteer "I wrote the word zoned out/high question mark."

In its written decision, the district court found that the State had moved to dismiss Juror 3 for cause and that Juror 3 was dismissed for reasons "unique" to her. Specifically, the district court noted that she was challenged for cause because of "well-articulated concerns based upon [her] experiences." In finding that the prosecution's strike was not racially motivated, the district court noted that the "challenge[] directed at [her] appears valid based upon the evidence." The district court made no specific finding on Juror 3's demeanor.

Ish is correct that the record clearly demonstrates that it was he, not the State, who challenged Juror 3 for cause. Thus, the district court's specific factual finding that the State challenged her for cause is clear error as it is unsupported by substantial, competent evidence. If a prosecutor misrepresents the record, this supports the inference that the proffered reason is pretext. *See Miller-El I*, 545 U.S. at 246. Here, it is unclear whether the prosecutor misrepresented the record. For instance, the district court's question about the for-cause challenge could have been visually directed at defense counsel and the prosecutor merely affirmed before defense counsel

17

could. Indeed, defense counsel, at no point below, corrected the district court's misapprehension concerning the for-cause challenge despite the opportunity to do so at the *Batson* hearing and after the district court entered its written decision. Likewise, the State's written *Batson* brief merely indicates that Juror 3 was challenged for cause without indicating the source of the challenge. Accordingly, we are unable to infer that the prosecutor misrepresented the record in this case, but we take the ambiguous nature of the record into consideration.

The ultimate finding in a *Batson* challenge is whether the State's strike of Juror 3 was "motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2251. To determine whether this factual error undermines the court's ultimate finding of lack of discriminatory motive, we must view it in light of all the relevant circumstances, evidence, and arguments. In other words, we assess the district court's finding of discriminatory intent in striking Juror 3 as an individual matter, but our assessment is informed by all the circumstances discussed up to this point.

Initially, we take note that, if the prosecution actually had made the challenge for cause, then the district court was correct that its proffered race-neutral reason would support finding a lack of discriminatory intent. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 145, 114 S. Ct. 1419, 1430, 128 L. Ed. 2d 89 (1994) ("When an explanation is required, it need not rise to the level of a 'for cause' challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual."). However, the prosecution's decision to exercise a peremptory challenge by citing a reason that they actively argued against when the defense offered it as a for-cause challenge raises the inference of pretext.

We also must take note that the State offered a secondary explanation. It explained its strike by noting that Juror 3 seemed a "bit out of it," "zoned out," or "high." While this could be a legitimate race-neutral reason to pass *Batson*'s second step, we may not credit it on appeal because the district court failed to make a finding on Juror 3's demeanor. Accordingly, like the *Snyder* court, we would be left to guess at the reason for its absence. Perhaps the district court credited that reason but failed to mention it. Maybe the district court could not remember Juror 3's demeanor or maybe it disagreed with the State's assessment of her demeanor. Or, just as likely, the district court could have rested its decision solely on the first reason and decided it was unnecessary to reach the second. As a result, we may not credit that reason to support the district court's finding.

The findings in a *Batson* challenge carry constitutional consequences. That does not change the factual nature of those findings. "[A]n issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question." *Hernandez v. New York*, 500 U.S. 352, 366, 111 S. Ct. 1859, 1870, 114 L. Ed. 2d 395 (1991) (citation omitted).

Thus, the district court's finding of a lack of discriminatory intent must be supported by substantial, competent evidence. Recalling that substantial and competent evidence exists if there is evidence in the record that a reasonable trier of fact could accept and rely upon in making the factual finding challenged on appeal, we determine that the record lacks such evidence here. The district court made no explicit finding on the prosecutor's demeanor. There is no specific finding on Juror 3's demeanor. The district court's finding that the prosecutor's proffered reason was not pretextual is based, in part, on a clearly erroneous factual finding. The only support for the district court's ultimate finding is the State's appellate argument. The State insists that it would make little sense for an ill-intentioned prosecutor to oppose the challenge for cause against a juror that the prosecutor wished to exclude for discriminatory motives. While this argument makes some logical sense, we think it too thin a reed to support the district court's ultimate finding because we must view this argument in the light of the other considerations. That is, we assess that argument in the shadow of the 100% exclusion rate, the shaky explanations for excluding Juror 1, the ambiguous record concerning the State's answer on the for-cause challenge, and the clearly erroneous finding on that challenge. When viewed collectively, the record demonstrates that the court's ultimate finding that the State did not strike Juror 3 with discriminatory intent is unsupported by substantial, competent evidence, and thus, is clearly erroneous.

A successful *Batson* challenge demonstrates that the jury was constituted in violation of the Equal Protection Clause of the United State Constitution. Thus, "the composition of the trier of fact itself is called in question, and the irregularity may pervade all the proceedings that follow." *Powers v. Ohio*, 499 U.S. 400, 412–13, (1991). A constitutional flaw in the composition of the jury is fundamental error as it would persist throughout trial. *Batson*, 476 U.S. at 86–87. We therefore vacate the judgment of conviction and remand for a new trial with a new jury pool and jury selection.

The following list summarizing our conclusions should assists trial courts deciding *Batson* challenges in the future:

19

- A timely *Batson* challenge occurs before the jury is sworn and before the remainder of the venire is dismissed.

- Statistical evidence is not dipositive evidence of discriminatory intent but may be strong evidence on which to infer discriminatory intent and to establish a prima facie case.

- A trial court is not required to conduct a side-by-side comparative analysis if such comparison is not argued by the challenging party.

- A comparative juror analysis requires focusing on the proffered reason for the exclusion of the minority juror to determine pretext. Jurors offered for comparison should be closely analogous to that juror, though they need not be identical.

- A trial court may look to other struck witnesses to determine if the prosecutor's proffered explanation is pretextual, but this analysis should carry less weight than a traditional comparative juror analysis.

- A trial court should make a finding on whether each of the prosecutor's proffered explanations appears pretextual.

- If a prosecutor's proffered explanation relies on a juror's demeanor, a trial court should make specific factual findings regarding that juror's demeanor or else an appellate court is unable to credit that reason on appeal.

## B. The district court did not err in quashing Ish's subpoena duces tecum for the prosecution's voir dire notes.

In an effort to obtain materials to support a motion for new trial, Ish filed a post-trial subpoena duces tecum for "[a]ll written communication and documentation of the prosecuting attorney's staff pertaining to prospective jurors and voir dire[.]" The State moved to have the subpoena quashed, asserting that it was "unreasonable, oppressive, and requests work product not subject to disclosure." The district court granted the State's motion and quashed the subpoena after concluding that the notes were protected work product. On appeal, Ish urges this Court to determine, as a matter of first impression, that a prosecutor's voir dire notes are not protected work product when a defendant asserts a *Batson* challenge.

As the district court and the parties acknowledge, this is a matter of first impression in the state of Idaho. There is no question that jury-selection notes can be extremely probative of a prosecutor's discriminatory intent. A paradigmatic example of this surfaced in the Supreme Court's case of *Foster v. Chatman*, 136 S. Ct. 1737, 1740 (2016). There, a new trial was granted through post-conviction proceedings after the petitioner was able to produce the following from the prosecutor's case file in the underlying trial:

- the jury list on which the names of each black prospective juror were highlighted;

- questionnaires completed by several of the black prospective jurors, on which each juror's race had been circled.

- a draft affidavit by an investigator comparing black prospective jurors, and concluding that "[i]f it comes down to having to pick one of the black jurors, [this one] might be okay";

- handwritten notes identifying three black prospective jurors as "B#1," "B#2," and "B#3";

- a list of jurors noting "N" (for "no") next to the names of the jurors the State intended to strike showing that all five black prospective jurors had this notation;

- a list titled "[D]efinite NO's" containing six names, including all five black prospective jurors;

- a document titled "Church of Christ" with the notation "NO. No Black Church";

136 S. Ct. at 1744. In view of this evidence, the Supreme Court determined that the petitioner was able to show that the prosecutor was "intent on ensuring that none of the [black] jurors … would serve" and stated that "[t]he sheer number of references to race in that file is arresting." 136 S. Ct. at 1750, 1755. Of note, the petitioner obtained this smoking-gun evidence via a Georgia Open Records Act request. *Id.* at 1747.

The United States Supreme Court has not addressed whether such documents are only available in post-conviction proceedings or whether the defendant may obtain them during the *Batson* proceeding or by post-trial motion. All jurisdictions appear to agree that the prosecution's voir dire notes are protected work product. *See People v. Trujillo*, 15 P.3d 1104, 1107–08 (Colo. App. 2000); *Foster v. State*, 374 S.E.2d 188, 192 (Ga. 1988); *People v. Mack*, 538 N.E.2d 1107, 1115–16 (Ill. 1989); *Thorson v. State*, 721 So.2d 590, 595-96 (Miss. 1998); *State v. Antwine*, 743 S.W.2d 51, 67 (Mo. 1987); *Guilder v. State*, 794 S.W.2d 765, 767-68 (Tex. App. 1990).

We agree that a prosecutor's voir dire notes are protected work product. While Ish contends his request for the notes is governed by Rule 17, we disagree. Idaho Criminal Rule 17(b) provides for subpoenas duces tecum while Idaho Criminal Rule 16 governs discovery in criminal proceedings. Rule 16(g) explicitly exempts a prosecutor's work product from the general discovery disclosure requirements:

Prosecution Information Not Subject to Disclosure.

(1) Work Product. Disclosure must not be required of:

21

(A) legal research or of records,

(B) correspondence, or

(C) reports of memoranda to the extent that they contain the opinions, theories or conclusions of the prosecuting attorney or members of the prosecuting attorney's legal staff.

I.C.R. 16. Rule 16 contains a similar provision exempting the defense's work product. I.C.R 16(h).

Under the clear language of Rule 16, the prosecution's voir dire notes are protected work product. Anything jotted down in the voir dire notes would fall under the "opinion, theories or conclusion of the prosecuting attorney." I.C.R. 16(1)(c). Even the portions that would not fall under Rule 16's definition of work product would likely be excerpts from the jury questionnaire or voir dire—both sources that are equally available to the defendant. Thus, the notes are not subject to disclosure under Rule 16(g). Rule 16 applies to the prosecutor and defense counsel, while the subpoena power under Rule 17 extends to all others. *Compare* I.C.R. 17(b) (governing the attendance of "Witnesses") *with* I.C.R. 16(a) (governing the disclosure of evidence and materials "by the Prosecution" on written request).

While we determine that the prosecution's voir dire notes are protected work product, we need not decide whether using those notes during a *Batson* challenge constitutes waiver because Ish raises this argument for the first time on appeal. *See State v. Gonzalez*, 165 Idaho 95, 439 P.3d 1267, 1271 (2019) ("We will not hold that a trial court erred in making a decision on an issue or a party's position on an issue that it did not have the opportunity to address."). At the hearing on the State's motion to quash, Ish argued that that the rationale supporting the work product doctrine did not support applying it to a post-trial request for notes. In light of the clear import of Rule 16, we disagree. Ish argues that the notes would not expose a large amount of trial strategy because, at the post-trial stage, trial had concluded. However, we reach our conclusion looking at *Batson* challenges more generally. At the lower level, after a timely challenge, trial courts are given the discretion to either reseat the panel or simply reinstate an improperly struck juror. If the former, the prosecution's voir dire notes might expose segments of its trial strategy, or, at the very least, its voir dire strategy. This brings those notes squarely within the scope of work-product protections. We also decline to address whether an in camera review would be proper because Ish failed to urge that ground below.

We hold that the prosecution's voir dire notes are protected work product for purposes of a *Batson* challenge. We express no opinion on whether a prosecutor may waive this protection

22

because Ish has failed to preserve this issue for appellate review. Thus, we conclude that the district court did not err when it ruled that the prosecutor's voir dire notes were protected work product. Therefore, the district court did not err in quashing the subpoena duces tecum even though it should have been brought as a motion to compel.

**C. The district court did not err in determining that the destruction of the VHS surveillance tape was not the result of bad faith by the State.**

Ish argues that the district court erred when it denied his motion to dismiss and declined to include a jury instruction on the spoliation inference. As to the first claim, Ish contends that the district court's finding that there was no bad faith in the Pocatello Police Department's destruction of the VHS tape is clearly erroneous. In support, he points to conflicting testimony and the violation of police procedure leading to the destruction. The State argues that the finding that there was no bad faith is supported by the evidence in the record. As to his second claim, Ish argues that the district court erred when it declined to include a jury instruction on the spoliation inference because it did so by failing to recognize that it could still provide jury instructions on spoliation even if it didn't find a due-process violation. The State argues that a jury instruction on spoliation was not required for the jurors to be informed of the law because there was no bad faith. For the reasons below, we determine that the district court's finding that the police did not destroy the VHS tape in bad faith is supported by substantial, competent evidence. Because this issue overlaps with Ish's argument addressing jury instructions on spoliation, we will comment on the jury instructions even though we remand for a new trial.

Before trial, in February 2016, Ish filed a motion to compel seeking, among other things, "[a]ny explanation for 'lost video' from Duffy's Tavern relating to the 14th and 15th of June, 2009." The State responded that "[t]he contents of the original videocassette tape from Duffy's Bar were transferred to a Digital Video Disc and the original videocassette tape was destroyed" and that it would call witnesses "to explain the destruction and transfer process."

At the evidentiary hearing, witnesses testified that the destruction of the tape was against police policy, but was done in a large-scale evidence room cleaning. The evidence logs showed that only Detective Daniels had checked the video out of evidence and had returned it after two days. At the hearing, he testified that he never made a copy of the VHS. The evidence room cleaning involved the destruction of thousands of pieces of evidence and involved an employee who was not an evidence technician helping in destroying the evidence. Afterwards, the district court ordered briefing to address the issue as a matter of spoliation of evidence.

23

In its briefing, the State admitted that the tape should not have been destroyed, but argued that its destruction was inadvertent, and thus, Ish could not show that it was done in bad faith. The State pointed out that Ish was not charged, and discovery was not instigated, until 3 years after the tape had been destroyed. This, the State argued, demonstrated that the State could not have understood that the full tape contained exculpatory evidence and eliminates any chance that its destruction amounted to concealment. In response, Ish argued that bad faith was the only explanation for the State failing to disclose the destruction of the tape, the police department's failure to follow protocol, the State's inability to explain who copied the tape and why, and whether the DVD is edited or modified. Ish argued that while these facts may not rise to the level of a *Youngblood* violation individually, they rise to that level if viewed cumulatively.

The district court denied Ish's motion. In its written decision, the district court noted that Ish's motion "took the form of essentially a spoliation/destruction of evidence situation" which required a "determination as to [the] effects of that on the case [and] Ish's due process rights." The district court ruled that Ish was unable to prove bad faith and made the following factual findings:

> Sometime following the death of Eugene L. Red Elk on June 14, 2009, a VHS copy of the surveillance video from Duffy's Bar was obtained by the Pocatello Police department. It was entered into evidence storage on June 17, 2009. On or about September 4, 2012, the tape was destroyed. An alleged DVD copy of the tape was made, but there is no evidence to suggest who made the copy, if the copy is an accurate and complete reflection of the original, and for what purpose it was made. The State disclosed the existence of the copy on July 8, 2015 and Ish was given a copy on October 21, 2015 after Ish filed a Motion to Compel. . . .
>
> At oral arguments, Aida Carrillo and Dee Williams, evidence technicians for the Pocatello Police Department, testified that in 2012, the Chief of Police ordered an inventory of the evidence room, along with the direction to destroy unnecessary evidence files. This direction was given in order to clean things up. A timeframe was given and individuals logged and destroyed evidence. It is clear from the testimony that any evidence related to an ongoing or open case should not have been destroyed, but this VHS tape was inadvertently destroyed along with hundreds of other tapes and documents which were appropriately destroyed. This undertaking took roughly 16 months to complete. During that timeframe, thousands of items were destroyed . . .

The district court emphasized that "the destruction of evidence occurred almost three years prior to Ish being charged for the crime in question." Thus, the district court reasoned that the destruction was inadvertent because there was no indication that the people who destroyed the tape had any idea of its potential relevance. In short, the district court determined that the tape "slipped through the cracks" and was destroyed against policy in a large-scale evidence purge.

After this ruling, Ish requested an instruction on spoliation that would instruct the jury that it could infer that the destroyed VHS was unfavorable to the State if the jury found that the State was negligent or deliberate in destroying the tape:

> Evidence has been presented that the Pocatello Police Department took custody of a VHS tape which contained surveillance footage of the inside of Duffy's Tavern on the evening of June 14, 2009. If you find that the loss of the VHS tape was deliberately or negligently brought about by the actions of the Pocatello Police Department, you may infer that the VHS tape was unfavorable to the State of Idaho's position.

The district court deferred ruling on the issue until later on during trial. At trial, the defense mentioned the missing video in its opening. Both the State and the defense elicited testimony about the missing tape from various witnesses. One of those witnesses was Detective Daniels. In apparent contradiction to his pretrial testimony, he testified that he had made the copy of the tape.

Right before closing arguments occurred, the district court took up the issue and read its decision into the record:

> In regard to the instruction about the destruction or spoliation of evidence, the Court would first refer back to its April 28th, 2016, decision. The spoliation doctrine is applicable in both civil and criminal cases.
> In [*Paradis v. State*, 110 Idaho 534, 535, 716 P.2d 1306, 1307 (1986),] the Idaho Supreme Court laid out three factors which must be considered in a criminal case when an allegation of destruction of evidence is raised. First, whether the evidence was material to the question of guilt or the degree of punishment; two, whether the defendant was prejudiced by the loss or destruction of the evidence; and, three, whether the government was acting in good faith when it destroyed or lost the evidence.
> In this case, the Court does not know what value, if any, the video surveillance would have had; so the first prong is not met. However, in 1988, the United States Supreme Court in [*Arizona v. Youngblood*, 488 U.S. 51 (1988)] ruled that when evidence of unknown value is destroyed, the defendant must show bad faith on the part of the police in order to have a ruling in his favor. And they basically say in that case that you presume that one and two have been met, and you focus on three; so that's what I'm doing.
> The Idaho Supreme Court has gone further and stated that where the value in evidence is unknown . . . the materiality and prejudice elements are presumed, and the inquiry focuses on the bad—presence of bad faith. That's [*State v. Edney*, 145 Idaho 694, 698, 183 P.3d 782, 786 (Ct. App. 2008)]. It's a Court of Appeals decision, but it cites [*State v. Lewis*, 144 Idaho 64, 65, 156 P.3d 565, 566 (2007)].
>
> [T]his Court would note that it is still difficult to conclude that the destruction of this tape was done to prejudice Mr. Ish, as its destruction occurred approximately three years before he was even charged with this crime; but, for purposes of argument, the Court will follow the standard in *Edney* and only look at

the issue of bad faith. Bad faith is more than mere negligence, and it refers to a calculated effort to circumvent the disclosure requirements. That comes from [*Brady v. Maryland*, 373 U.S. 83 (1963)]. Whether or not this calculated effort exists depends upon a party's knowledge and actions. That comes from [*Courtney v. Big O Tires, Inc.*, 139 Idaho 821, 823, 87 P.3d 930, 932 (2003)].

In such situations, behavior must indicate that the evidence was lost or destroyed because the party did not want the evidence available for use by the other party. The merely negligent loss of evidence does not support the inference, nor would the intentional destruction of an item that a party had no reason to believe had any evidentiary significance at the time it was destroyed.

As the Court has previously noted in its written decision, it was readily admitted that the destruction of the VHS tape from Duffy's bar was a mistake and was not in line with policy; however, there's been no indication that bad faith existed.

Consistent with the Court's prior finding that, while the tape, it's clear, should not have been destroyed, there's nothing in the record to indicate that the Pocatello Police Department had any idea what was on that tape and that the destruction of such was done to prejudice Ish. So I'm not going to give an instruction to the jury regarding the destruction of evidence in this case.

At the hearing or after the hearing on March 16th, 2016, the Court did not find that any bad faith existed and nothing in the trial has caused that opinion to change; so an instruction is not going to be given.

Both parties discussed the missing tape and its possible implications in closing arguments.

As a general matter, "spoliation" refers to "the intentional destruction, mutilation, alteration, or concealment of evidence." Black's Law Dictionary (11th ed. 2019). As an evidentiary matter, the spoliation doctrine is "a form of admission by conduct." *Courtney v. Big O Tires, Inc.*, 139 Idaho 821, 824, 87 P.3d 930, 933 (2003). Succinctly put,

[t]he evidentiary doctrine of spoliation recognizes it is unlikely that a party will destroy favorable evidence. Thus, the doctrine of spoliation provides that when a party with a duty to preserve evidence intentionally destroys it, an inference arises that the destroyed evidence was unfavorable to that party. Spoliation is a rule of evidence applicable at the discretion of the trial court.

*Courtney v. Big O Tires, Inc.*, 139 Idaho 821, 824, 87 P.3d 930, 933 (2003).

Though an evidentiary matter, the spoliation doctrine collides with the constitution in criminal cases when spoliated evidence was in possession of the State. In *Paradis v. State*, this Court announced a test for determining when a defendant's due process rights have been violated by the State's loss or destruction of allegedly exculpatory evidence: "(1) whether the evidence was material to the question of guilt or the degree of punishment; (2) whether the defendant was prejudiced by the loss or destruction of the evidence; and (3) whether the government was acting in good faith when it destroyed or lost the evidence." 110 Idaho at 539, 716 P.2d at 132. We have

26

recognized that the Supreme Court's subsequent decision in *Youngblood* consolidated these three factors in cases where the destroyed evidence is of unknown value "through its reasoning that materiality and prejudice to the defense can be presumed where the government acts in bad faith." *Stuart v. State*, 127 Idaho 806, 816, 907 P.2d 783, 793 (1995).

In *State v. Fain*, this Court determined that, even if a defendant could not prove that the spoliation of evidence rose to the level of a constitutional violation, then the district court could nevertheless instruct the jury that it could consider the fact that the State lost or destroyed the evidence as "one factor . . . to consider in deliberations. 116 Idaho 82, 96, 774 P.2d 252, 266 (1989). However, more recently, we have explained that "the merely negligent loss or destruction of evidence" is insufficient to invoke the spoliation doctrine; "the circumstances of the act must manifest bad faith." *Courtney*, 139 Idaho at 824, 87 P.3d at 933. In *Courtney v. Big O Tires*, this Court held that a district court erred by informing the jury that it could infer that evidence destroyed by the negligent act of the defendant was unfavorable to the defendant.[2] *Id.* There, the instruction told the jury that it could infer that the evidence was unfavorable to the other party upon a finding of merely negligent conduct. *Id.* This Court explained:

> Whether or not conduct constitutes an admission depends upon the party's knowledge or intent that can be inferred from that conduct. For the loss or destruction of evidence to constitute an admission, the circumstances must indicate that the evidence was lost or destroyed because the party responsible for such loss or destruction did not want the evidence available for use by an adverse party in pending or reasonably foreseeable litigation. *The merely negligent loss of evidence will not support that inference, nor would the intentional destruction of an item that a party had no reason to believe had any evidentiary significance at the time it was destroyed.* There may be circumstances, however, where such inference could be drawn from the reckless loss or destruction of evidence.

*Id.* at 824, 87 P.3d at 933 (emphasis added). We have since reiterated that "[b]ad faith is more than mere negligence" in the context of spoliation. *State v. Lewis*, 144 Idaho 64, 67, 156 P.3d 565, 568 (2007).

---

[2] The jury instruction provided as follows:

> The tire at issue in this case has been lost. Therefore, you must first determine whether reasonable explanation for the loss of the tire has been presented by Defendant Big-O Tires, Inc. If you determine that the loss of the tire was deliberately or negligently brought about by the actions of Defendant Big O Tires, Inc., you may infer that the tire was unfavorable to their position.

*Courtney v. Big O Tires, Inc.,* 139 Idaho 821, 823, 87 P.3d 930, 932 (2003).

With this background, we first address whether there was a due-process violation and find no error in the district court's conclusion that the destruction of the VHS tape did not amount to a due-process violation requiring dismissal. In addressing its decision, we are mindful that "[c]redibility of witnesses and weight of testimony are matters resolved by the trial court as trier of fact and will not be set aside on appeal unless clearly erroneous." *Stuart v. State*, 127 Idaho 806, 813, 907 P.2d 783, 790 (1995) (citing I.R.C.P. 52(a)). "A factual finding is clearly erroneous only if it is not supported by 'substantial and competent evidence in the record.'" *Id.* (quoting *Pace v. Hymas*, 111 Idaho 581, 589, 726 P.2d 693, 701 (1986)).

The district court found that the destruction of the tape was part of a 16-month-long inventory and routine destruction of "unnecessary evidence files." The process resulted in the destruction of "thousands" of pieces of evidence, and the State readily admitted that the VHS tape should not have been destroyed under police procedure. The destruction was done by evidence technicians, who testified that they had no idea what the evidentiary value of the tape was. In fact, the evidence tag on the tape only indicated the offense was "disturbance" and was a tape from the "recorder inside [the] bar."

As noted by the district court, at the time the VHS tape was destroyed, the police likely had the same incentive to preserve it as Ish did. At the time, no one was charged in connection with Red Elk's death and Ish would not be charged until three years later. While Ish attacks the testimony of Detective Brown, he does so by comparing inconsistencies between the spoliation hearing and the trial testimony. This would give fodder to impeachment on cross-examination at trial and can be used to show that a jury instruction should be given, but it does not undermine the Court's pretrial factual findings on bad faith. Accordingly, there is substantial, competent evidence supporting the district court's decision.

We now turn to Ish's arguments on the jury instruction for spoliation. We exercise free review over whether the jury was given proper instructions. *State v. Severson*, 147 Idaho 694, 710, 215 P.3d 414, 430 (2009). "A trial court presiding over a criminal case must instruct the jury on all matters of law necessary for the jury's information." *Id.* (citing I.C. § 19-2132). Each party is entitled to request the inclusion of specific instructions. *Id.* However, such instructions will only be given if they are "correct and pertinent." I.C. § 19-2132. We have said that a proposed instruction is not "correct and pertinent" if it is: (1) an erroneous statement of the law; (2)

28

adequately covered by the other instructions; or (3) not supported by the facts of the case. *Id.* at 710–11, 215 P.3d at 430–31 (citing *State v. Olsen*, 103 Idaho 278, 285, 647 P.2d 734, 741 (1982)).

Here, under our prior case law, the district court did not err in declining to give the requested instruction because it contained a misstatement of the law. While Detective Brown's inconsistent statements, along with other considerations, could lend support to Ish's request for a jury instruction as "supported by the facts of the case," this does not, by itself, require giving the instruction. Ish's proposed instruction would have instructed the jury that it could infer that the evidence was unfavorable to the State even if it only found that the State destroyed the tape negligently. As we explained in *Courtney*, negligence is too low a standard to invoke a spoliation inference. 139 Idaho at 824, 87 P.3d at 933. Accordingly, the district court did not err in rejecting the instruction.

## IV. CONCLUSION

We vacate the judgment of conviction and remand with instructions to call a new jury pool and hold a new trial.

Justices BRODY, BEVAN, STEGNER, and MOELLER **CONCUR.**