# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 52335

STATE OF IDAHO,

    Plaintiff-Respondent,

v.

EMERSON CLYDE BUCK, IV,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

**Boise, June 2025 Term**

**Opinion filed: October 1, 2025**

**Melanie Gagnepain, Clerk**

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Jason D. Scott, District Judge.

The judgment of the district court is <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Appellant. Jenny C. Swinford argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Mark W. Olson argued.

_____

MOELLER, Justice.

Emerson Clyde Buck, IV ("Buck"), appeals his judgment of conviction for first degree murder (with a deadly weapon enhancement) and resisting and obstructing an officer. During jury selection, the prosecutor used one of his three peremptory strikes to remove the only Black juror in the venire, Juror 17. Buck alleged that the strike was racially motivated and raised a *Batson*[1] challenge. The district court ultimately denied the challenge, concluding the State had proffered a race-neutral and non-pretextual reason for the strike. At the conclusion of Buck's six-day trial, the jury found him guilty of both charges. Buck received a sentence of 40 years to life.

On appeal, the Idaho Court of Appeals affirmed the district court. Regarding Buck's *Batson* challenge, and based on its interpretation of *Hernandez v. New York*, 500 U.S. 352, 365 (1991), it held that no *Batson* violation occurred because Buck "did not establish a prima facie case of

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

discriminatory intent . . . ." *State v. Buck*, Dkt. No. 49110, 2023 WL 6133215 (Idaho Ct. App. Sept. 20, 2023). Buck petitioned this Court for review, which we granted.

On review, Buck again argues that the district court erred when it: (1) denied his *Batson* challenge, (2) limited cross-examination regarding alternate perpetrator evidence, and (3) prevented his attorneys from introducing facts not in evidence in his closing argument. Buck further asserts that, should the Court deem any of these errors to be individually harmless, the doctrine of cumulative error should apply. As explained below, although we disagree with Court of Appeal's interpretation of *Hernandez*, we affirm the district court's judgment of conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the morning hours of January 19, 2020, Norma Buck ("Norma") heard Buck, her son, yell something to the effect of "you'll never say that again, son of a bitch." She later testified that she heard three loud pounding noises, entered the bedroom, and found her brother-in-law, James Buck ("James"), lying on the floor bleeding from a wound to his neck. Norma, her husband, and her son all shared a home with James in Garden City, Idaho. Upon discovering James lying gravely injured on the floor, Norma called 911. An autopsy later determined that James had suffered a mortal wound to his right carotid artery, which was likely caused by a knife.

When police arrived at the scene, they noted that Buck's phone and wallet were still in the home, about an arm's length away from a knife block. It was later discovered that a knife was missing from the block. The police also observed blood droplets leading out the front door. Based on these observations, law enforcement immediately attempted to locate Buck for questioning. When officers found Buck about an hour later, he fled into a nearby field. Once law enforcement had apprehended Buck, they observed fresh slice wounds on his hands and blood droplets on his socks. Buck was arrested and charged with first degree murder with an enhancement for using a deadly weapon in the commission of a crime. Forensic scientists later determined that the blood droplets on Buck's socks contained James' DNA. The State later amended the Information to include a misdemeanor charge of resisting and obstructing an officer based on Buck's flight before his arrest. Buck pleaded not guilty to both charges and his case proceeded to trial.

Jury selection commenced on May 5, 2021. The venire consisted of 34 jurors, one of whom, Juror 17, was apparently Black. During voir dire, the prosecutor asked if there were any jurors who "just do not want to be a juror," or if there was anybody that already had an " 'I don't want to do

2

this' kind of feeling." Jurors 7, 10, 15, 17, and 26 all responded affirmatively.[2] The State questioned Juror 17 further about his desire not to serve and eventually challenged Juror 17 for cause. The defense was then permitted to question Juror 17, after which the court denied the State's request to strike Juror 17 for cause.

After the prosecutor and defense counsel both passed the remaining jury panel for cause, 26 of the original 34 prospective jurors remained. Each side was then allotted three peremptory challenges.[3] Ultimately, the trial jury would consist of 12 jurors and two alternates. The six remaining members of the venire were excused after the jury was selected.

The prosecutor used his second peremptory challenge to strike Juror 17. Buck's counsel requested a sidebar and raised a *Batson* challenge. This interaction is not in the record; however, the court continued with the remaining peremptory strikes until the trial jury was selected. After excusing the empaneled jury for the remainder of the day, the district court went on the record and explained defense counsel's *Batson* challenge and the prosecutor's rationale for the peremptory strike. The district court summarized:

> Juror 17 appeared to be African-American, as the defendant appears to be as well, and that's the, I guess, the basis for the challenge, that the State had used a peremptory challenge against the only apparently African-American juror in the jury pool, so that seemed to me that it may have made out a prima facie case [under the first step of *Batson*], I suppose, of the challenge being exercised based on race considerations, and so I asked the prosecutor to articulate a race-neutral explanation for the exercise of a peremptory challenge against Juror 17.

> The prosecutor indicated along these lines: that, during the prosecutor's voir dire, the prosecutor had asked jurors about any things going on in their lives that would be sources of distraction, that might prevent them from giving their full attention to this case and handling their duties as jurors attentively, and Juror 17 was one of the jurors who expressed concerns along those lines. Juror 17 indicated that he had a lot of stuff going on in his life with school and work and a pregnant girlfriend, and the flavor, to me, of Juror 17's remarks was that he very much did not wish to be here.

> The prosecutor also indicated that the prosecutor watched Juror 17 during portions of voir dire and saw body language or positioning suggestive of not paying attention, not being engaged. I'm not in a position to express either agreement or disagreement on that. I didn't perceive it myself, but regardless, I do agree that the

---

[2] The follow-up interactions with Jurors 7, 10, 15, and 26 are addressed in the analysis below.

[3] At the time of trial, this Court had issued a series of statewide orders in response to the COVID-19 pandemic. The order in effect at the time of the trial in this matter was Amended Order re: Jury Trials ¶ 9(b) (Idaho Oct. 8, 2020), which reduced the number or peremptory challenges in cases where the charges were not punishable by death to three per side. *See State v. Harrell,* 173 Idaho 45, 48–49, 54, 538 P.3d 818, 821–22, 827 (2023).

prosecutor gave a race-neutral explanation for the exercise of the peremptory challenge that I conclude was a genuine explanation and is not a pretext or a cover for a decision to excuse the only black juror on grounds of race, and as I said, I didn't observe one way or the other whether that juror appeared disengaged at times during voir dire, but I do share the perspective that the juror strongly, strongly indicated a desire to not be here, not to be selected, not to serve on this jury, and that, it seems to me, is a genuine race-neutral reason for the exercise of the challenge.

Thus, the record shows that the district court made an uncertain finding that Buck had raised a prima facie case of intentional discrimination, reasoned that the State had countered with a race-neutral explanation for exercising the peremptory challenge, and ultimately concluded that the racial-neutral explanation offered by the prosecutor was genuine and not pretextual.

The trial lasted six days. During its case-in-chief, the prosecutor called, among other witnesses, Detective Thorndyke, who had investigated the case. Thorndyke testified that during his investigation, he had interviewed other individuals but that nothing "fruitful" came of these interviews. On cross-examination, defense counsel attempted to elicit testimony from Thorndyke regarding two other individuals who had been interviewed by the State in connection with the murder: D.E. and G.J. The State objected, arguing this went beyond the scope of their direct examination. After allowing some leeway for defense counsel to explore this issue, the prosecutor again objected, this time on relevance grounds. After a sidebar, the district court sustained the objection, concluding the defense was improperly attempting to introduce potential alternate perpetrator evidence. The district court reasoned that this evidence was not relevant to whether Buck was innocent or guilty because the defense had shown no evidence suggesting that anyone other than Buck was the perpetrator. The district court clarified that it was not preventing Buck from poking holes into the overall propriety of the investigation, but it was not going to allow "repeated innuendo[s] that someone else" was the perpetrator absent some evidence to that effect.

Later, during closing argument, defense counsel stated that Buck had decided to go for a walk on the night in question, and when he left the house, everyone had been alive and well. Specifically, defense counsel told the jury:

> January 19th of last year, Emerson Buck IV, this man, he left his house, he left his mom, he left his dad, he left his uncle who has been in his nuclear family since he was ten years old. They were alive, they were well. As you can probably surmise from this, Emerson is an adult, he did what he did that night, completed his appointed rounds, he decided to go for a walk.

4

The prosecutor objected, asserting defense counsel was (1) referencing facts that were not in evidence and (2) essentially asserting an undisclosed alibi defense. The district court sustained the objection, stating:

> That's an alibi under the statute, under the controlling statute that requires notice, because you are giving a different location. You obviously don't have to accede to the fact he was there, but you can't offer some other thing he was doing or place he was because you didn't introduce any evidence of it. There has to be evidence of it.

Thereafter, the district court instructed the jury to disregard defense counsel's previous statement.

After deliberating approximately four hours, the jury found Buck guilty on both charges and concluded that the evidence supported an enhancement for use of a deadly weapon. The district court sentenced Buck to life in prison with a minimum fixed period of confinement of 40 years. On the resisting and obstructing charge, the district court gave Buck credit for time served. Buck appealed.

On appeal, the Court of Appeals affirmed Buck's conviction. *State v. Buck*, No. 49110, 2023 WL 6133215 (Idaho Ct. App. Sept. 20, 2023). Thereafter, Buck petitioned this Court for review, which we granted.

## II.    STANDARDS OF REVIEW

When this Court is presented with a petition asking us to review a Court of Appeals' decision, we give "serious consideration" to the Court of Appeals' views but review the lower court's decision directly. *State v. Buehler*, 173 Idaho 717, 720, 547 P.3d 1203, 1206 (2024), citing *State v. Robinett*, 141 Idaho 110, 112, 106 P.3d 436, 438 (2005). We have explained that "[t]his Court is not merely reviewing the correctness of the Court of Appeals' decision; rather, this Court is hearing the matter as if the case were on direct appeal from the trial judge's decision." *State v. Ross*, 170 Idaho 58, 61, 507 P.3d 545, 548 (2022) (quoting *Marsalis v. State*, 166 Idaho 334, 339, 458 P.3d 203, 208 (2020)).

Other applicable standards of review for the issues presented on appeal are discussed in the text below.

## III.    ANALYSIS

On appeal, Buck argues that the district court committed three errors that occurred before, during, and after the evidentiary phase of the trial. First, he argues that the court erred during voir dire when it denied his *Batson* challenge after the only Black juror was removed from the panel. Second, he maintains that the court abused its discretion during the trial phase by limiting his cross-

examination of a State witness regarding alternate perpetrator evidence. Third, Buck contends that, during closing arguments, his attorney was improperly precluded from arguing that he was taking a walk when the murder occurred in his home. Additionally, Buck raises a fourth issue on appeal, asserting that the doctrine of cumulative error should apply if more than one error is found. We will address each argument in turn.

## A. The district court did not err in denying Buck's *Batson* challenge.

Buck first argues that the district court erred by rejecting his *Batson* challenge. He asserts that because he is Black, the prosecutor's use of his second (of three) peremptory challenges to remove the only Black juror from the venire, Juror 17, evidenced discriminatory intent, thereby violating his right to equal protection under the law.

"In *Batson v. Kentucky*, the United States Supreme Court ruled that a State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial." *State v. Ish*, 166 Idaho 492, 500, 461 P.3d 774, 782 (2020) (citing *Batson v. Kentucky*, 476 U.S. 79 (1986)). "The Supreme Court has 'vigorously enforced and reinforced' *Batson*'s holding and 'guarded against any backsliding.' " *Id.* (citing *Flowers v. Mississippi*, 588 U.S. 284 (2019)). Even a "single discriminatory peremptory strike violates the Equal Protection Clause." *Id.*

*Batson* challenges proceed in three steps. Under the first step, the moving party "must make a prima facie showing that a peremptory challenge has been exercised with discriminatory intent." *Id.* (citing *State v. Araiza*, 124 Idaho 82, 87, 856 P.2d 872, 877 (1993)). A prima facie case is established "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93–94). Second, once a prima facie showing has been made, *Batson* requires that the non-moving party "come forward with a racially-neutral explanation for challenging the prospective juror." *Ish*, 166 Idaho at 500, 461 P.3d at 782 (quoting *Araiza*, 124 Idaho at 87, 856 P.2d at 877). The third and final step requires the trial court to conclude whether the explanation offered for the peremptory strike "overcomes the inference of discrimination established" by the moving party's prima facie showing of discrimination. *Id.* (quoting *Araiza*, 124 Idaho at 87, 856 P.2d at 877).

Since either party may raise a *Batson* challenge, it is "the party asserting discriminatory use of a peremptory challenge [that] bears the ultimate burden of persuasion and must show that purposeful discrimination was, in fact, the basis for use of the peremptory challenge." *Araiza*, 124

6

Idaho at 88, 856 P.2d at 878. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality). Thus, the "third step requires the district court to evaluate the prosecutor's credibility" as the "best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Ish*, 166 Idaho at 500, 461 P.3d at 782 (citation omitted); *see also Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (citation omitted).

When reviewing a trial court's decision on a *Batson* challenge, this Court affords "great deference to the trial court's finding of discriminatory intent and will not disturb that finding absent clear error." *Ish*, 166 Idaho at 501, 461 P.3d at 783 (citing *Araiza*, 124 Idaho at 87, 856 P.2d at 877); *see also Snyder*, 552 U.S. at 477 ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."). We have explained that "[a] factual finding is clearly erroneous only if it is not supported by 'substantial and competent evidence in the record.' " *Ish*, 166 Idaho at 515, 461 P.3d at 797 (quoting *Stuart v. State*, 127 Idaho 806, 813, 907 P.2d 783, 790 (1995)).

     1. *Pursuant to* Hernandez*, it was permissible for the district court to bypass the first step of* Batson *(establishing of a prima facie case of discrimination) because (a) the prosecutor offered a race-neutral reason for the peremptory strike in step two and (b) the court's ruling on the third step was not clearly erroneous.*

In its decision below, although it affirmed the district court, the Court of Appeals concluded that Buck had not established a prima facie case of discriminatory intent under the first step of *Batson*. *State v. Buck*, No. 49110, 2023 WL 6133215, at *5 (Idaho Ct. App. Sept. 20, 2023). The Court of Appeals reasoned that the district court erroneously assumed that using a "peremptory challenge to strike the only identified black prospective juror," was enough to establish a prima facie case. *Id.* On petition for review, Buck argues that the first *Batson* step, establishing of a prima facie case of discrimination, is moot in light of the United States Supreme Court's holding in *Hernandez*, 500 U.S. 352. The State counters with a single sentence in its briefing that Buck failed to establish a prima facie showing of purposeful discrimination. However, the State ultimately agrees with the defense that the first step of the *Batson* challenge is moot considering *Hernandez* and the circumstances of this case "because the prosecutor went on to state his race-neutral reason for the peremptory challenge, and the court ultimately concluded that [Buck] failed to meet his burden to demonstrate purposeful discrimination . . . ." The case presents us with an opportunity

to consider the Court of Appeals' recent jurisprudence on *Batson* challenges and clarify the proper interpretation of *Hernandez*.

In *State v. Wright*, 174 Idaho 206, 216–17, 552 P.3d 633, 643–44 (Ct. App. 2023), *review dismissed as improvidently granted* (Jul. 31, 2024), the Court of Appeals recently rejected an "implicit finding" of discrimination by the district court for purposes of establishing a prima facie case of discrimination. The parties contested whether a juror, removed by the State via a peremptory challenge, was actually Black.[4] Rather than attempting to conduct an investigation to ascertain whether the prospective juror's apparent race coincided with her actual race, the district court prudently skipped the first step of *Batson* and went straight to addressing the second and third steps, ultimately concluding that a racial-neutral explanation had been offered and no discriminatory intent had been shown. *See id.* at 216–17, 552 P.3d at 643–44.

In *Wright*, the Court of Appeals concluded that the district court had acted improperly in bypassing step one of *Batson*; however, it still affirmed the district court's denial of the *Batson* challenge on the grounds the State's explanation for the strike was "specific and related to the case to be tried." *Id.* at 219, 552 P.3d at 645. Under its *Batson* step one analysis, the Court of Appeals emphasized the fact that Wright had failed to provide an adequate record on appeal because he failed to present evidence of race: "Here, there is *no* evidence in the record of any potential juror's race." *Id.* at 217, 552 P.3d at 644. The Court of Appeals suggested that, under *Hernandez*, it would be error to grant a defendant's *Batson* challenge absent an explicit finding that the first step of *Batson* was met based on a prima facie showing of racial discrimination:

> We agree that *Hernandez* holds that once a court rules on the third step of the *Batson* analysis, the question of whether the moving party has established his initial, prima facie case is irrelevant for purposes of shifting the burden of proof to the State. *However, we decline to hold that a court's willingness to shift the burden of proof means that all the necessary factual predicates for the claim have been established.*

*Id.* at 218, 552 P.3d at 645 (emphasis added).

Inasmuch as the Court of Appeals made a similar ruling in this case, we take this occasion to abrogate this portion of the Court of Appeal's analysis in *Wright* and clarify the proper

---

[4] When the *Batson* challenge was first raised, the prosecutor responded, "Your Honor, [Juror] No. 1, she did not appear to the State as [B]lack. I don't know where defense is even coming with that. . . . I--I don't think she looked that [B]lack. She certainly didn't to me . . . ." *Id.* at 219, 552 P.3d at 646 (second and fourth alterations in original) (footnote omitted).

interpretation and application of *Hernandez*. For the reasons discussed below, we hold that, under *Hernandez*, when the prosecutor offers a race-neutral explanation for the strike pursuant to the second step of *Batson*, and the trial court concludes that there was no discriminatory intent under *Batson*'s third step, it is unnecessary for a trial court to return to the first step and conduct a further inquiry to ascertain the race of the prospective juror. Of course, in the event the court concludes that the State has failed to satisfy the second and third steps of *Batson*, the court must then return to step one and require the defendant to make a prima facie showing of discriminatory intent. However, in this case, as in *Wright*, there was no need to return to step one.

In *Hernandez*, the prosecutor used four peremptory challenges to exclude potential Latino jurors. 500 U.S. at 355–56. After Hernandez raised a *Batson* challenge, but prior to the district court ruling on its first step (a prima facie showing of discriminatory intent), the prosecutor offered several race-neutral reasons for striking the prospective jurors. *Id.* at 355–57. The trial court believed the reasons given by the prosecutor and denied the *Batson* challenge. *See id.* at 372. On appeal, the United States Supreme Court explained that, despite typically waiting for the trial court to make a ruling on the first *Batson* step before proceeding to the second step, it was not concerned with this "departure from the normal course of proceedings." *Id.* Instead, the Supreme Court clarified the necessary procedural steps in addressing a *Batson* challenge:

> We explained in the context of employment discrimination litigation under Title VII of the Civil Rights Act of 1964 that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The same principle applies under *Batson*. *Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.*

*Id.* at 359 (alteration in original) (emphasis added). Under this standard, the Supreme Court affirmed the trial court's denial of the *Batson* challenge, holding that the inquiry into the prima facie case was unnecessary and "[t]he trial court did not commit clear error in choosing to believe the [race-neutral] reasons given by the prosecutor." *Id*. at 372.

Unlike *Hernandez*, the district court in this case made an uncertain ruling on the first *Batson* step. The district court addressed the first step of *Batson* as follows:

9

> Juror 17 *appeared* to be African-American, as the defendant *appears* to be as well, and that's the, *I guess*, the basis for the challenge, that the State had used a peremptory challenge against the only *apparently* African-American juror in the jury pool, so that *seemed* to me that it *may have* made out a prima facie case, *I suppose*, of the challenge being exercised based on race considerations . . . .

(Emphasis added). Any deficiency in the record due to the inconclusive ruling by the district court on the first step of *Batson* does not change the applicability of *Hernandez* since the prosecutor went on to offer a race-neutral explanation for the challenge, and the district court properly ruled on the ultimate issue of discriminatory intent. Under *Hernandez*, if a prosecutor offers a race-neutral explanation for the peremptory challenge, the first step of the analysis becomes unnecessary. In other words, if the apparent race of the defendant and the prospective juror were not questioned or disputed by the prosecutor, a prima facie case has essentially been conceded by the prosecutor.

Here, the prosecutor apparently recognized that the apparent race of Buck and Juror 17 aligned and immediately offered two race-neutral reasons to strike Juror 17. First, Juror 17 had expressed concern about pressing life circumstances (school, work, and a pregnant girlfriend) distracting him from his juror duties. Second, the prosecutor explained that Juror 17's demeanor during voir dire indicated that he was not paying attention and not engaged. Based on these proffered reasons, the district court proceeded to the third step of the *Batson* analysis and concluded that "I do agree that the prosecutor gave a race-neutral explanation for the exercise of the peremptory challenge that I conclude was a genuine explanation and is not a pretext or a cover for a decision to excuse the only [B]lack juror on grounds of race . . . ." Thus, in this case, as in *Hernandez*, where the trial court properly ruled on the "ultimate question of intentional discrimination," the preliminary issue of whether Buck made a prima facie showing under step one of *Batson* was not necessary to uphold the district court's overall conclusion. *Hernandez*, 500 U.S. at 359.

> 2. *The State offered a race-neutral reason for its peremptory strike.*

Turning to the second *Batson* step (a race-neutral explanation for the challenge), Buck concedes that the State offered a race-neutral reason for its peremptory strike. In his opening brief on appeal, Buck "acknowledges the prosecutor offered a facially race-neutral reason for its peremptory challenge to Juror 17." Therefore, since the second step of the *Batson* analysis is uncontested, we need not address this step.

*3. The district court's conclusion that the State satisfied the third step of* Batson *by overcoming the inference of racial discrimination is not clearly erroneous.*

Based on the above analysis, Buck's *Batson* challenge now turns on the district court's step-three reasoning. The third step in a *Batson* analysis requires the trial court to (a) "consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties" and (b) determine whether the explanation "overcomes the inference of discrimination established . . . ." *State v. Ish*, 166 Idaho 492, 500, 503, 461 P.3d 774, 782, 785 (2020) (first quoting *Flowers v. Mississippi*, 588 U.S. 301, 302 (2019); and then quoting *State v. Araiza*, 124 Idaho 82, 856 P.2d 872 (1993)). At this step, the trial court should weigh whether the defendant has "carried his burden of proving purposeful discrimination." *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 332, 338 (2003)). "To support a claim that a prosecutor's peremptory strikes were made with discriminatory intent, the defendant" can present evidence such as:

- statistical evidence about the prosecutor's use of peremptory strikes against minority prospective jurors as compared to non-minority prospective jurors in the case;

- evidence of a prosecutor's disparate questioning and investigation of minority and non-minority prospective jurors in the case;

- side-by-side comparisons of minority prospective jurors who were struck and non-minority prospective jurors who were not struck in the case;

- a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

- relevant history of the State's peremptory strikes in past cases; or

- other relevant circumstances that bear upon the issue of racial discrimination.

*Id.* at 503, 461 P.3d at 785 (citing *Flowers*, 588 U.S. at 302–03).

Whether the challenger has carried the burden of proving discriminatory intent turns in large part on "the persuasiveness of the prosecutor's justification for his peremptory strike." *Id.* (quoting *Cockrell*, 537 U.S. at 338–39). "[T]he best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (second alteration in original) (quoting *Hernandez*, 500 U.S. at 365). Because "race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention)," the "trial court's firsthand observations" are of foremost importance. *Id.* Thus, the "trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory

11

intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.* These credibility determinations are "peculiarly within a trial judge's province," thus, "in the absence of exceptional circumstances" this Court should defer to the trial court. *Id.* (quoting *Hernandez*, 500 U.S. at 365–66).

Buck argues that considering "all relevant circumstances, the prosecutor's reason for striking the only Black juror was, in fact, substantially motivated by discriminatory intent." Specifically, Buck argues that (1) the statistical evidence strongly suggests discriminatory intent, (2) the prosecutor's disparate questioning of the only Black juror is strong evidence of discriminatory intent, (3) side-by-side comparisons of the prosecutor's reasons to strike the only Black juror but keep similar jurors is strong evidence of discriminatory intent, and (4) the other relevant circumstances prove the prosecutor acted with discriminatory intent. We will examine each contention in turn.

i. While statistical evidence in this case evinces a discriminatory *impact*, it does not necessarily establish a discriminatory *intent*.

Buck points out that, by striking the only Black juror, the prosecutor excluded 100% of the Black jurors. Of course, with only one such juror in the venire, this is an undeniable mathematical conclusion that is not contested by the State. Buck submits that this "stark" statistic raises a "strong inference of discrimination." In *Ish*, a case where the prosecution used its six peremptory challenges "to strike the only [six] potential jurors who were minorities," this Court noted that the "use of peremptory challenges resulting in discriminatory impact raises an *inference* of discriminatory intent." 166 Idaho at 498, 504, 461 P.3d at 780, 786 (emphasis added) (citing *Cockrell*, 537 U.S. at 342). However, the Court further noted that even a 100% exclusion rate under such circumstances is not *conclusive proof* of discriminatory intent. *Id*. at 504, 461 P.3d at 786.

Undoubtedly, in a case with a Black defendant, striking the sole Black potential juror resulted in a discriminatory impact. As the district court suggested, this discriminatory impact raises the specter of discriminatory intent: "[T]he State had used a peremptory challenge against the only apparently African-American juror in the jury pool, so that seemed to me that it may have made out a prima facie case . . . ." While we agree with the district court that this statistic may raise an inference of discriminatory intent—especially since only a single strike is at issue in this case—we reiterate that this statistic is insufficient on its own to demonstrate discriminatory intent.

12

*Ish*, 166 Idaho at 504, 461 P.3d at 786. Therefore, we must look to other relevant circumstances in deciding the issue.

    ii.  <u>There was no disparate questioning of Juror 17.</u>

Next, Buck argues that the "prosecutor's disparate questioning of the only Black juror is strong evidence of discriminatory intent." During voir dire, the prosecutor inquired of the prospective jurors whether there was anyone who had a feeling that they "don't want to do this," meaning that they did not want to be selected as a juror. Jurors 7, 10, 15, 17, and 26 all answered affirmatively. Buck maintains that because the prosecutor's questioning of Juror 17 was disparate from Jurors 7, 10, 15, and 26, this provides compelling evidence of discriminatory intent.

The United States Supreme Court has specified that "disparate questioning can be probative of discriminatory intent." *Flowers*, 588 U.S. at 308 (citing *Cockrell*, 537 U.S. 331–32). In *Flowers*, the State "asked the five [B]lack prospective jurors who were struck a total of 145 questions," whereas "the State asked the 11 seated [W]hite jurors a total of 12 questions." *Id.* The Supreme Court highlighted that, "by asking a lot of questions of the [B]lack prospective jurors or conducting additional inquiry into their backgrounds, a prosecutor can try to find some pretextual reason—any reason—that the prosecutor can later articulate to justify what is in reality a racially motivated strike." *Id.* at 310. Despite emphasizing the disparate questioning that took place between prospective White and Black jurors, the Supreme Court clarified that "disparate questioning or investigation alone does not constitute a *Batson* violation." *Id.*

Here, this case presents us with an opposite scenario because Buck argues the inverse of what occurred in *Flowers*. Buck asserts that the prosecutor asked *fewer* questions of Juror 17 than he did of potential Jurors 7, 10, 15, and 26. Buck explains his argument as follows:

> In this instance, asking more questions to the non-Black jurors in an effort to rehabilitate their unwillingness to serve, while asking no questions to the only Black juror to clarify or rehabilitate, provided the prosecutor with a pretextual reason for both its for-cause and peremptory challenges.

The State counters that any differences in the manner of the prosecutor's questioning were "not so stark as to demonstrate a purposeful discriminatory intent based upon race."

Turning to the prospective jurors Buck maintains were disparately questioned, he first points to Juror 26, a software developer. In response to the State's question whether there was anyone who had an " 'I don't want to do this' kind of feeling," Juror 26 stated:

[Juror 26:] I actually would like to be a part of [the jury]. It's just work. We're hiring a new guy, and that's what that is. It's mostly like it's inconvenient. I wouldn't say it's like a hardship, but a couple of weeks and we've got a lot going on at work. Other than that, if it weren't for just having work-related complications, I'd be super happy to be part of it.

Following his answer, the State asked Juror 26 a total of six follow-up questions, predominantly focusing on whether his work schedule would interfere with his ability to be rested enough to hear evidence the following day. Juror 26 later clarified that he would be able to move things around to have someone else train the new employee, freeing him up to serve as a juror. While he would still have to work some during the evenings, Juror 26 indicated this would not affect his ability to hear evidence and be impartial during the trial.

Juror 10 stated that she had just returned from Texas after attending the funeral for her father. Consequently, she was behind on work and would be forced to work at night during the trial. Juror 10 also explained that, if she were to participate in the trial, she would have to miss certain work obligations, which had already been postponed because of the funeral. Based on this interaction, the State moved to dismiss Juror 10 for cause. Buck did not object, so the district court excused Juror 10 after only asking a single question.

After dismissing Juror 10 for cause, the State reiterated its original question to the venire, asking:

[PROSECUTOR:] Is there anyone else who has something going on in your life -- and it doesn't have to be work, it could be just something distracting, something that is hard or something that is going on with you -- that would affect your ability to listen?

To this, Juror 17 responded:

[Juror 17:] Yeah. I just got, like, too much stuff going on outside, like, school, work. My girlfriend is, like, a couple months pregnant, you know, so I don't think I'd be able to devote that type of, like, focus onto here.

The State followed up:

[PROSECUTOR:] Okay. And I hear what you're saying. So it sounds like just with life's pressures --

[Juror 17:] Right.

[PROSECUTOR:] -- you think it would be difficult for you to focus?

[Juror 17:] Yes.

[PROSECUTOR:] So let me clarify just a couple of points.

14

When we talk about focus, what we mean is you're going to come in and you're going to hear evidence day in and day out, and that evidence will be sometimes civilian witnesses, sometimes law enforcement, and then sometimes scientific or technical information. And what you're expressing is that the -- the life pressures you have going on are so significant that you can't sit and set aside time to actually think about the evidence being presented to you?

[Juror 17:] Yes.

[PROSECUTOR:] So are you telling us right now that that would affect your ability to be fair either to the State or the defense in evaluating fairly the evidence?

[Juror 17:] Yes.

[PROSECUTOR:] Judge, based on that response, I'd challenge the juror for cause.

Thus, prior to challenging Juror 17 for cause, the State asked him three clarifying questions, fewer than Juror 26, but more than Juror 10. The last question suggests that the prosecutor was challenging Juror 17 for cause based on his inability to be fair to either party.

Defense counsel then attempted to rehabilitate Juror 17 by clarifying the concerns that made Juror 17 reluctant to serve:

[DEFENSE COUNSEL:] Can you articulate or can you express what, in particular, would be the specific hardship that you would experience if you were to be called as a juror in this case?

[Juror 17:] The attention to my girlfriend that's pregnant, and then also school, because I've got a lot of that going on.

[DEFENSE COUNSEL:] Okay. So --

[Juror 17:] My focus with those two categories would be taken away from here.

. . . .

[DEFENSE COUNSEL:] Okay. And you would agree that pretty much everybody in this panel has those types of pressures and those types of concerns, and do you think you could put that aside and be able to, if you were called, listen to the jury instructions and follow the instructions of the [c]ourt?

[Juror 17:] I don't really want to, to be honest.

A review of the transcript shows that defense counsel posed more open-ended questions to Juror 17 when compared to the prosecutor's questions. Consequently, Juror 17's disinterest in participating in the trial became even more palpable than when the State questioned him.

15

Next, the prosecutor inquired of Juror 15, a director of St. Luke's OB/GYN clinics across the state. Juror 15 stated that his work obligations would distract him from the trial. The State asked him a series of four questions inquiring into his ability to remain focused during trial. Juror 15 expressed that if he were able to make arrangements at work for someone to step in and cover for him, then it would eliminate any potential distractions he might face during trial.

Lastly, the prosecutor questioned Juror 7. He was a farmer and testified that he was "responsible for irrigating about 150 acres on our family farm." If called to be a juror, Juror 7 explained that he would have to work two and a half hours before trial daily and another two and a half hours after trial every day to irrigate his crops. When the prosecutor asked whether there was anything that could be done to help alleviate these burdens during trial, Juror 7 replied, "Not really. We're already about three people short, so I'm already taking responsibilities from other people who aren't able to do their full responsibilities and help them out." This interaction likewise included four questions by the State.

Buck argues that, despite Juror 26's and Juror 7's circumstances being "more of an inconvenience" than Juror 17's, the State "challenged Juror 17 for cause after a single question about Juror 17's situation." To Buck, this "disparate questioning and investigation supports a finding of purposeful discrimination." Critically, contrary to Buck's assertion, the State asked Juror 17 more than a single question. In fact, the State asked him at least three separate times whether his life circumstances were so distracting that he would be unable to fairly evaluate the evidence. Each time, Juror 17 unequivocally said yes. Moreover, the State did not ask Juror 17 far fewer questions compared to other jurors as Buck maintains. Indeed, the State asked Juror 17 more questions before moving to strike him than it did of Juror 10.

Notwithstanding the difference in questioning techniques utilized by the prosecutor ("yes or no" questions) and defense counsel (open-ended questions) noted above, Juror 17 effectively conveyed to both the State and the defense that he did not want to participate in the trial. Juror 17's certain responses differed from the equivocal answers given by Juror 26 and Juror 15. Both Juror 26 and Juror 15 indicated that their employment-related distractions could be significantly alleviated if they were allowed to make arrangements at work prior to trial. And, unlike Juror 17, who strongly indicated he did not wish to be a part of the jury, Juror 26 and Juror 15 both seemed amenable to being a juror so long as they could make the necessary arrangements.

Reviewing the various interactions that the prosecutor had with potential jurors, there is scant, if any, indication that he engaged in disparate questioning of Juror 17 that would be indicative of discriminatory intent. There was no lopsidedness in the prosecutor's questioning of Juror 17 versus the other prospective jurors. The fact that Juror 17 was not asked *exactly* the same questions as other members in the venire does not indicate the prosecutor was attempting to find a pretextual reason to strike Juror 17. To the contrary, the transcript conclusively establishes that Juror 17 was the most adamant of the prospective jurors in his desire not to serve on the jury.

We conclude that this serves as a legitimate basis for the State to strike Juror 17. The modest differences in questioning styles and approaches used by the prosecutor with different jurors in this case was not indicative of discriminatory intent—it was more likely reflective of the difference in the ages, backgrounds, occupations, demeanors, and personalities of the respective jurors. To require counsel to ask the same follow up questions, in the same manner, to every prospective juror would detract from the spontaneity and overall dynamic of effective voir dire. Indeed, voir dire by its name ("to speak the truth") literally connotes a quest for the truth so that any disqualifying bias on the part of a juror can be discovered. We are not inclined to disrupt this proven and important part of every jury trial by imposing rigid, scripted questioning in place of the informal, organic mode of questioning that has served us well for centuries. For these reasons, we conclude that the record in this case does not support a finding of racial animus on the part of the prosecutor based on the neutral differences in questioning demonstrated here.

### iii. Side-by-side comparisons

Buck also argues that comparing the prosecutor's reasons for striking Juror 17, while keeping similarly situated jurors, supports a finding of "discriminatory intent" because it amounts to "purposeful discrimination." Buck points to similarities between the situations of Jurors 7, 17, and 26, to suggest that, while the prosecutor overlooked concerns expressed by Jurors 7 and 24, he relied on similar concerns to justify striking Juror 17.

"Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred" because it can "suggest that the prosecutor's proffered explanations for striking [B]lack prospective jurors were a pretext for discrimination." *Flowers*, 588 U.S. at 311. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v.*

*Dretke*, 545 U.S. 231, 241 (2005). However, the Supreme Court has also made clear that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008). Thus, an appellate court "must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." *State v. Ish*, 166 Idaho 492, 505, 461 P.3d 774, 787 (2020) (citing *Snyder*, 552 U.S. at 483). "When comparison evidence is offered, the comparison is narrowly focused on the proffered reason given by the prosecution as applied to other jurors, not merely jurors who were similar for reasons not touched upon by the prosecution's proffered reason." *Id.*

First, we note that defense counsel did not raise any purported similarities between Jurors 7, 17, and 26 at trial. Furthermore, any comparison should be "narrowly focused" on the reasons the prosecutor struck Juror 17. *See id*. Here, the prosecutor offered two race-neutral reasons for peremptorily striking Juror 17. First, Juror 17 had expressed persistent concerns about managing school, work, and having a pregnant girlfriend. Second, the prosecutor indicated that he had observed Juror 17 "during portions of voir dire and saw body language or positioning suggestive of not paying attention, not being engaged." Thus, when comparing Juror 17 with Jurors 7 and 26, we look to the record to see if there was any evidence indicating Jurors 7 and 26 had familial or school obligations (in addition to work), which might interfere with their ability to be impartial, as well as any apparent demeanor suggesting that they were resistant to serving on the jury.

A review of the record indicates that Jurors 7 and 26 only indicated that they had work responsibilities, which might prevent them from giving the trial their full attention. They did not mention other responsibilities, such as school or a partner pregnancy, which might impact their attention during trial. Furthermore, the record does not reflect that Jurors 7 and 26 were as disengaged as Juror 17, nor did they vocalize as much disinterest in participating in the trial as Juror 17 did. Therefore, the prosecutor's proffered reason for striking Juror 17 did not apply "just as well to an otherwise-similar nonblack [panelist] who is permitted to serve." Accordingly, we conclude that this is not indicative of discriminatory intent. *Dretke*, 545 U.S. at 241.

### iv. Other relevant circumstances

Buck also relies on two other "relevant circumstances" to support his claim that a *Batson* violation occurred. First, Buck argues that the prosecutor's reliance on Juror 17's demeanor (i.e., his inattention) as a race-neutral reason for the strike cannot be credited because the district court

did not make a finding on the juror's demeanor. Second, Buck argues the prosecutor's use of the remaining two peremptory challenges to strike Jurors 15 and 21 also indicates discriminatory intent.

With respect to Buck's first point, in *Ish*, this Court stated that "the trial court must evaluate . . . whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." 166 Idaho at 500, 461 P.3d at 782. Buck argues that, absent a finding by the district court, the inattentiveness reason proffered by the prosecution carries no weight. Contrary to Buck's assertion, a trial court need not make an explicit finding on a prospective juror's demeanor to reject a *Batson* challenge. *Thaler v. Haynes*, 559 U.S. 43, 48 (2010). Indeed, the United States Supreme Court has clarified that *Batson* does not require that a demeanor-based explanation for a peremptory challenge be rejected solely because the judge did not personally observe or recall the relevant aspect of the juror's demeanor. Rather, "where the explanation for a peremptory challenge is based on a prospective juror's demeanor, the judge should take into account, among other things, any observations of the juror that the judge was able to make during the *voir dire*." *Id.* Thus, where a judge did observe or recall aspects of the juror's demeanor, those observations should be afforded weight.

Here, the trial judge did not make an explicit finding regarding Juror 17's inattention. However, the district court did "take into account" its observations that Juror 17 was disengaged in ruling on its overall *Batson* decision. Indeed, the district court stated that, "the flavor, to me, of Juror 17's remarks was that he very much did not wish to be here." To that effect, per *Ish*, the district court was evaluating whether Juror 17's demeanor could credibly be said to have exhibited the basis for the strike alleged by the prosecutor. While the district court's statement regarding Juror 17 was not an explicit finding of Juror 17's demeanor, that does not mean the prosecutor's rationale for striking Juror 17 must be discredited.

Second, Buck contends that the prosecutor's use of his remaining peremptory challenges on jurors who expressed a belief that systemic racism is an issue demonstrates discriminatory intent. During voir dire, Jurors 15 and 21 both answered affirmatively when asked if systemic racism was a problem. Citing *Flowers*, 588 U.S. at 310, Buck argues that it is "difficult to 'explain[] away' the prosecutor's decision to strike the only Black juror, who voiced his experience with systemic racism, and two other jurors that were cognizant of systemic racism as 'mere happenstance.' " (Alteration in original).

Striking prospective Jurors 15 and 21 might give rise to an inference of racial discrimination, but it is certainly a weaker inference than the statistical evidence in this case. Importantly, this was not an issue raised below, so the prosecutor did not have an opportunity to respond to this allegation of racial animus involving Jurors 15 and 21 as he did with the concerns raised regarding Juror 17. Additionally, reasonable inferences might be made as to why the prosecutor struck Jurors 15 and 21, which had nothing to do with racial bias. While Juror 15 testified that he believed systemic racism to be a problem, he also stated, outside of the presence of the other prospective jurors, that he might have seen the defendant fleeing the police on the date of the crime while he was driving to work. Juror 15 also indicated that he had significant work responsibilities that might interfere with his focus during the trial.

With respect to Juror 21, some additional facts illuminate other non-racially discriminatory reasons why the prosecutor might have exercised a peremptory strike against them. During voir dire, the prosecutor put forth the following hypothetical: Suppose two kids are left home alone with a full cookie jar. When a parent returns home, the cookie jar is empty. When "Kid No. 1" enters the kitchen, he says that he does not know what happened to the cookies but that he saw their sibling, "Kid No. 2," "around" the cookie jar. When the parent goes up to Kid No. 2's room, Kid No. 2 is "startled when the door opens. [He] quickly brushes [his] face . . . and then kind of looks at you kind of startled again, but with some attention." Upon further inspection, the parent finds crumbs on Kid No. 2's shirt, cheek, and hands. Based on this hypothetical, the prosecutor asked prospective Juror 21, "Who took the cookies?" The following exchange ensued:

> [Juror 21:] I have two kids. Quite likely, both of them.
>
> [PROSECUTOR:] Okay.
>
> [Juror 21:] I don't think, just given that information, that I can make an assessment that that's exactly what happened.
>
> [PROSECUTOR:] Why not?
>
> [Juror 21:] Well, Kid 1 could have took [sic] a cookie and given it to Kid 2 and said, "Here. Dad gave this to me. You can have it," trying to get him in trouble. There's all kinds of different scenarios with kids that could happen.

The prosecutor then changed the hypothetical so that Kid No. 2 was home alone when the cookies were taken. The prosecutor asked if this change in facts changed Juror 21's analysis. Juror 21 answered "Possibly. I mean, there would have to be other information. I'd need to know, were there other people in the house." This exchange continued, and the prosecutor asked whether Juror

20

21 was comfortable concluding it was Kid No. 2 who ate the cookies when there was no one else in the house around the time the cookies disappeared. Juror 21 maintained that they were not comfortable doing so. Before moving on to a subsequent juror, the prosecutor said to Juror 21, "The point is that we're just trying to figure out what happened and what you're comfortable saying happened or didn't happen and how you think about it, and I appreciate all of your responses and your candor there."

A review of the jury selection transcript shows that the prosecutor had other interactions with Jurors 15 and 21, which might have given him other reasons, not relating to their views on systemic racism, to strike them. Regardless, while certain factors, like statistics, might indicate the prosecutor acted with discriminatory intent in exercising the State's peremptory challenges, there is substantial evidence supporting the district court's conclusion that the prosecutor's proffered race-neutral reasons regarding Juror 17 that were not pretextual. Absent any clear error by the district court, we affirm the district court's denial of Buck's *Batson* challenge.

## B. The district court did not abuse its discretion by limiting Buck's cross-examination of Detective Thorndyke regarding alternate perpetrators.

Next, Buck argues that the district court abused its discretion when it limited his cross-examination of Detective Thorndyke. During trial, the district court cut off Buck's cross-examination of Thorndyke regarding two individuals, D.E. and G.J., who might have provided other investigative leads. Buck argues that this limitation was improper because the evidence he sought to introduce did not amount to alternate perpetrator evidence. The State disagrees, maintaining that the district court properly excluded Buck's "[speculative cross-examination about [G.J.] pursuant to [Idaho Rule of Evidence] 403." (Capitalization altered).

"Evidence is relevant if '(a) it has any tendency to make a fact more or less probable than it would be without the evidence[,] and (b) the fact is of consequence in determining the action.' " *State v. Garcia*, 166 Idaho 661, 670, 462 P.3d 1125, 1134 (2020) (alteration in original) (quoting I.R.E. 401). However, even relevant evidence can be excluded by the district court "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." I.R.E. 403. While the relevance of evidence is reviewed de novo, a trial court's decision to admit or exclude evidence "will only be disturbed on appeal when there has been a clear abuse of discretion." *Dunlap v. State*, 170 Idaho 716, 742, 516 P.3d 987, 1013 (2022) (citation omitted).

"When reviewing a trial court's decision for an abuse of discretion, this Court must analyze '[w]hether the trial court[:] (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choice available to it; and (4) reached its decision by the exercise of reason.' " *State v. Radue*, 175 Idaho 297, ___, 564 P.3d 1230, 1244 (2025) (alterations in original) (citing *State v. Ochoa*, 169 Idaho 903, 912, 505 P.3d 689, 698 (2022)).

The "rulings of the trial court regarding cross-examination of a witness" are likewise reviewed under the abuse of discretion standard. *Id.* at ___, 564 P.3d at 1248 (first citing *Clark v. Klein*, 137 Idaho 154, 156, 45 P.3d 810, 812 (2002); and then citing *Ochoa*, 169 Idaho at 912, 505 P.3d at 698). Additionally, like with other types of evidence, trial courts enjoy broad discretion in admitting and excluding alternate perpetrator evidence. *See State v. Parker*, 157 Idaho 132, 138, 334 P.3d 806, 812 (2014) (citing *State v. Joy*, 155 Idaho 1, 6, 304 P.3d 276, 281 (2013)).

In *State v. Meister*, this Court made clear that, if the evidence is relevant, Idaho Rule of Evidence 403 governs the admissibility of alternate perpetrator evidence. 148 Idaho 236, 240, 220 P.3d 1055, 1059 (2009). This Court articulated that:

> If the defendant proffers evidence which merely tends to mislead the jury that another person committed the crime, or the evidence is not relevant because it does not tend to make the defendant's involvement more probable or less probable, then it is within the trial court's discretion to find the evidence inadmissible. Mere inferences that another person *could* have committed the crime will most likely not be relevant, and if relevant will still be subject to the limitation provisions of [Rule] 403.

*Id.* at 241, 220 P.3d at 1060. Thus, for alternate perpetrator evidence to be admissible, it must be based on more than mere inferences, speculation, or innuendos suggesting that someone else could have committed the crime to even be deemed relevant. Evidence that does not make it more or less likely that the defendant committed the crime is not relevant. However, even if the evidence passes the relevance threshold, it is still subject to Idaho Rule of Evidence's interest balancing test. *See id.* at 240, 220 P.3d at 1059.

During trial, the prosecutor called Detective Thorndyke to the stand. During direct examination, the State inquired into Thorndyke's investigation into other potential leads. Thorndyke testified that no other leads ever came to his attention that pointed law enforcement away from Buck. He further testified that he had interviewed other people, but nothing "fruitful"

22

had come from those interviews. On cross-examination, defense counsel followed up on this by asking whether Thorndyke had spoken with one particular individual, D.E.:

> [DEFENSE COUNSEL:] You did go and speak with [D.E.], correct?
>
> [DET. THORNDYKE:] Yes.
>
> [PROSECUTOR]: Objection; beyond the scope.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: Your Honor, the reason I was going to go into this now is the State elicited specific testimony that he followed through with any leads that may have been established. And I believe we can establish that this was a potential lead that perhaps he should have investigated more fully.
>
> THE COURT: Okay. Understood. With the additional explanation, I'll permit some leeway here.

After the court allowed the defense to continue with this line of questioning, defense counsel inquired as to Thorndyke's conversation with D.E., asking whether Thorndyke had accessed D.E.'s phone to determine where he was on the night James was killed. Despite three additional objections by the State relating to this line of questioning, the court continued to allow inquiry into Thorndyke's investigation of D.E. However, after a fourth objection by the State, the district court asked the parties to sidebar. At the sidebar, the district court asked defense counsel where this line of questioning was headed, and defense counsel stated:

> [DEFENSE COUNSEL]: It's leading to a person who may have had a motive and may have an opportunity.
>
> [PROSECUTOR]: Who.
>
> [DEFENSE COUNSEL]: [G.J]. Again it's a lead, it's not necessarily --
>
> THE COURT: It's a lead?
>
> . . . .
>
> [PROSECUTOR]: The testimony was he did follow up on the leads and they didn't lead anywhere. He did follow up on all the leads the detective gave him to follow up on. Because he wasn't sleeping in the night and thought of something that wasn't directed to him to follow up on is different. This is the alternate person theory.
>
> THE COURT: That's the problem I'm starting to have with this, there is repeated innuendo suggesting that someone else may have done the crime and that you don't have a basis for shifting the blame to any one person so you're just try to repeatedly --
>
> [DEFENSE COUNSEL]: I'm sorry, I've having a hard time hearing.

23

THE COURT: I'm sorry. So this line of questioning keeps leading to, well, it could have been Norma Buck, it could have been Emerson Buck III, it could have been this [D.E.] person you were just talking about, it could have been apparently whoever this lead is and the problem is . . . that is alternate perpetrator evidence. You don't have anything that -- this was discussed earlier in the course of trial whether the defendant was going to try to pin the murder on some other person, and the answer I got I believe from [defense counsel] was that no, that was not going to happen. Nevertheless, this is where this sort of questioning is headed is an attempt to suggest that one of these other persons might be the murderer. Whether the police followed up on a lead concerning some particular other person doesn't mean anything if that other person is not the person who committed the crime. It's not germane, it's not important, it doesn't shed any light on the defendant's innocence or guilt.

Thereafter, the district court sustained the State's relevance objection, stating:

So you're trying to impugn the investigation by suggesting that other people might have been the murderer without having any substantial evidence that that other person is the murderer. And that's the problem. You're crossing the line into alternate perpetrator evidence without a substantial basis to do so. So I'm going to cut this off at this point.

We're not going to have more innuendo that some other person is the murderer. You're entitled to try to dispute the case against your client, of course, but the alternate perpetrator doctrine does not permit you to . . . raise veiled suggestions or innuendos that some other person is the murderer without substantial evidence, without evidence that really tends to bear on your client's innocence or guilt.

While sustaining the prosecutor's relevance objection, the district court did not specifically reference Idaho Rule of Evidence 403, even though it used language somewhat indicative of the rule. Later that same day, the court clarified its rulings, explaining that it was "really an application of Rule 403" and should be understood in that way. The court further explained that, from its perspective, the alternate perpetrator evidence "has scant, if any, probative value" and instead was "an attempt to confuse the issues from the defendant's guilt or innocence."

Contrary to Buck's assertion, the evidence Buck sought to elicit on cross-examination of Thorndyke was alternate perpetrator evidence. Alternate perpetrator evidence is evidence that a third party committed the crime. *See Parker*, 157 Idaho at 139, 334 P.3d at 813. While defense counsel's initial cross-examination into the thoroughness of Thorndyke's investigation was proper, the district court aptly curtailed this line of questioning when it became apparent defense counsel was not just poking holes in the thoroughness of the investigation, but was attempting to point the finger at someone without any evidence tending to show someone else committed the crime.

24

Having concluded that Buck attempted to introduce alternate perpetrator evidence via Thorndyke's cross-examination, we turn to whether this evidence was relevant. As stated previously, "Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence[,] and (b) the fact is of consequence in determining the action." *Garcia*, 166 Idaho at 670, 462 P.3d at 1134 (alteration in original) (quoting I.R.E. 401). "Whether a fact is 'of consequence' or material is determined by its relationship to the legal theories presented by the parties." *Ochoa*, 169 Idaho at 913, 505 P.3d at 699 (citation omitted).

We agree with the district court that the evidence Buck sought to introduce was "not germane, [and was] not important, [because] it doesn't shed any light on the defendant's innocence or guilt." In other words, Buck did not meet the relevance threshold because all he attempted to offer was mere speculation that someone else might have had a motive or opportunity to commit the crime. This is not enough to establish relevance under *Meister*. Buck admitted that he had no substantive evidence to offer to suggest that someone else was guilty of the crime. Thus, all Buck could offer regarding alternate perpetrator evidence were "mere inferences" or innuendos that someone else could have committed the crime. Since this was all that Buck had to offer on cross-examination of Thorndyke, we conclude that the district court properly determined—after initially granting Buck's attorney some leeway during cross examination—that the evidence was not relevant.

Buck argues that because the district court did not contemporaneously engage in a Rule 403 analysis when ruling on the cross-examination, its "after-the-fact explanation cannot justify its earlier decision." However, having properly concluded that the evidence was not relevant under Rule 401 in the first instance, the district court need not have engaged in a Rule 403 analysis. Therefore, whether it did so in a timely manner is of no moment.

### C. The district court did not abuse its discretion by preventing Buck from discussing facts in his closing argument that were not in evidence.

During closing argument, defense counsel asserted that, on the night James was murdered, Buck "decided to go for a walk" and left his home where his mother, father, and uncle were all "alive" and "well." The State objected, maintaining this argument raised facts not in evidence. At a sidebar, the State further argued that these statements amounted to an undisclosed alibi defense. Defense counsel countered that this argument was not an alibi that required disclosure, it was merely part of its defense that Buck was not home when James died. Ultimately, the district court

agreed with the State that the statements amounted to an undisclosed alibi and instructed the jury to disregard the statement. Buck maintains the district court abused its discretion because defense counsel's argument that Buck decided to go for a walk on the night in question was supported by the evidence and was not an alibi defense that had to be disclosed.

Closing arguments are intended to "sharpen and clarify the issues for resolution by the trier of fact in a criminal case." *Herring v. New York*, 422 U.S. 853, 862 (1975). Parties have "traditionally been afforded considerable latitude in closing argument to the jury and are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom." *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007) (quoting *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003)). This latitude, however, "has its limits." *Id.* "Closing argument should not include counsel's personal opinions and beliefs about . . . the guilt or innocence of the accused," "misrepresent or mischaracterize the evidence," or "refer to facts not in evidence." *Id.* (citations omitted).

Buck argues that the statement that he "decided to go for a walk" is supported by the evidence adduced during the evidentiary phase of the trial. He argues that Norma's testimony supports this inference because she indicated that, "before she went to sleep on the night James was killed, [Buck] left the house, and she did not know if he came back before she woke up." Norma testified that Buck had left the house when she went to bed on January 18 and, to her knowledge, he was going to a friend's house and she was not sure whether he had come back by the time she woke up. However, this testimony does not give rise to an inference that Buck was "on a walk" when the crime happened. Norma also testified that she heard Buck's voice shouting "you'll never say that again, son of a bitch" prior to hearing three loud pounding noises and subsequently discovering James' body. While Buck may have gone on a walk earlier that evening before Norma went to sleep, he was clearly in the house when Norma woke up and heard him shouting. In light of this evidence, it is difficult to understand how her testimony could support an inference that Buck was not in the home when James was killed.

Having reviewed the record, we conclude that there was no evidence in the record that Buck was taking a walk when James was murdered. Thus, any argument to that effect by the defense in its closing argument was improper. Importantly, the evidence adduced at trial overwhelmingly establishes that Buck *was* present in the home at the time James was stabbed to death. For example, not only did Norma hear Buck's angry voice in the room shortly before

discovering James' body, but there was also evidence that (1) the blood found on Buck's socks contained James' DNA and (2) Buck's hands contained fresh slice wounds. Accordingly, regardless of whether Buck's closing argument was an attempt to introduce an undisclosed alibi defense or something else, we hold that his attorney's closing argument—suggesting that Buck was on a walk when James was murdered—was an improper attempt to introduce facts not in evidence. Therefore, the district court did not err in ordering the jury to disregard the statement.

### D. The district court did not commit cumulative error.

Lastly, Buck argues that, even if the district court's evidentiary errors were individually harmless, the cumulative effect of these errors denied him his right to a fair trial. "Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *State v. Perry*, 150 Idaho 209, 230, 245 P.3d 961, 982 (2010) (citing *State v. Martinez*, 125 Idaho 445, 453, 872 P.2d 708, 716 (1994)). "However, a necessary predicate to the application of the doctrine is a finding of more than one error." *Id.* (citing *State v. Hawkins*, 131 Idaho 396, 407, 958 P.2d 22, 33 (Ct. App. 1998)). Because we have found no errors in the district court's challenged rulings, we conclude that the necessary predicate for application of the cumulative error doctrine has not been established.

## IV.    CONCLUSION

For the reasons set forth above, we affirm Buck's judgment of conviction.

Chief Justice BEVAN, Justices BRODY, ZAHN, and MEYER CONCUR.